*726
 
 Opinion
 

 LAMBDEN, J.
 

 Leroy Emmanuel Lucas and Kenneth Ray Donaghe were each convicted in a joint jury trial of second degree murder (Pen. Code, §§ 187-189; all undesignated section references are to that code), robbery (§212.5) and conspiracy to rob (§§182, 212.5), with found-true special allegations of personal gun use (§ 12022.5, subd. (a)) and discharge at an occupied vehicle causing death (§ 12022.5, subd. (b)) as to Lucas, and simple arming (§ 12022, subd. (a)(1)) as to Donaghe. Defendants appeal following sentence to terms of fifteen years to life each plus, respectively, eight years, four months, and three years. We will affirm.
 

 Defendants carried out the three crimes on July 21, 1993, during an evening of driving around the Redwood City area in the company of Charles (Chuck) Williams and driver William (Bill) Long. Williams and Long testified on promises of partial immunity. A brief overview of the evidence serves to frame the issues.
 

 First in time came the conspiracy to rob. Lucas set out to rob Adam Janson of drugs and money. He made this known to the others, and Donaghe brought along a handgun. Donaghe sat in the backseat behind Lucas, the front seat passenger, and at one of three stops they made in a fruitless hour-long effort to find Janson, passed Lucas the gun to take with him when Lucas asked, “Do you have the heat?” Lucas placed the gun in his waistband and pulled his shirt over it, left the car, failed to find Janson, and returned the gun to Donaghe upon returning to the car.
 

 Next came the actual robbery, which was of a drug dealer in a neighborhood where the four drove to buy marijuana. Lucas announced his intent to take marijuana by pulling the gun, and Donaghe passed it up to him before they arrived. A Hispanic man handed a tinfoil packet to Lucas through the window and said it cost $10. Lucas showed him the gun at the window, said “This is me” (meaning this is mine) or “I don’t think so,” and the four drove off without paying. Lucas again returned the gun to Donaghe.
 

 Last came the murder. Around 10:30 p.m., as the four were riding down El Camino Real, Lucas noticed a red car adjacent to them at a red light. It was driven by Alvin Bondoc, and friends Zachary Matthews, Tasha Harrison and Greg Ramirez were passengers. (All three passengers testified at trial.) Lucas knew none of them but felt they were looking at them wrong. He said something like, “Look at those punks, they are nothing,” and had Long speed up when the light changed. At the next light, Lucas rolled down his window, called out “What the fuck are you looking at?” and leaned out the window to
 
 *727
 
 gesture or say “What’s up?”—a fighting taunt. Bondoc’s passengers did not take the threat seriously. Meanwhile, Donaghe said to his companions something about someone in the red car “dogging” (looking mean and hard at) them. As they drove on, Lucas said “Pass me the gun” or “You still have the heat?” Donaghe passed the gun on Lucas’s right side. Lucas took it in his left hand, aimed it out the window, under his right arm, and fired once. The shot shattered the red car’s window and fatally struck Bondoc in the head. The red car swerved out of control and crashed into an overpass. The foursome fled, and Lucas said something like, “Why did I do that?”
 

 Lucas testified having used methamphetamine, marijuana and alcohol that night, and feeling paranoid. He admitted getting the gun from Donaghe and pointing it over the door but claimed he did not mean to fire it. Defense testimony suggested a possible drug-induced overreaction or accident, and Lucas’s counsel urged jurors to find involuntary manslaughter at best.
 

 Donaghe did not testify. His counsel sought to impeach testimony about an apparently retaliatory incident in jail where Donaghe had called Long a “rat” or “snitch” and thrown hot water on him. Counsel urged in part that the shooting was a surprise, not a natural and probable consequence of handing Lucas the gun.
 

 Discussion
 

 Target-crime issues
 

 Donaghe, whose conviction for second degree murder rested on his having aided and abetted Lucas, raises several issues related to that theory.
 

 “Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a ‘natural and probable consequence’ of the crime originally aided and abetted. To convict a defendant of a non-target crime as an accomplice under the ‘natural and probable consequences’ doctrine, the jury must find that, with knowledge of the perpetrator’s unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant’s confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a ‘natural and probable consequence’ of the target crime that the defendant assisted or encouraged.”
 
 (People
 
 v.
 
 Prettyman
 
 (1996) 14 Cal.4th 248, 254, 267 [58 Cal.Rptr.2d 827, 926 P.2d 1013]
 
 (Prettyman).)
 

 
 *728
 
 Those principles were settled at the time of this trial in mid-1994, yet it was unsettled whether courts had a sua sponte duty to instruct on the elements of target crimes. One Court of Appeal decision held “yes”
 
 (People
 
 v.
 
 Mouton
 
 (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423]
 
 (Mouton));
 
 one held “no”
 
 (People
 
 v.
 
 Solis
 
 (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184]); and the standard instruction (CALJIC No. 3.02) had been revised in 1992 to present an alternative version to facilitate a “yes” answer. Also, after trial but in time for posttrial motions, our own division had aligned itself with Mouton's “yes” position, although our case had lost precedential value by the time of sentencing because it had been taken up by the Supreme Court on a grant and hold pending eventual resolution of the issue in
 
 Prettyman, supra,
 
 14 Cal.4th 248.
 

 The target-crime issue arose during trial in settling the instructions, and the court, in a curious compromise, said it refused to instruct on target crimes yet gave the revised CALJIC No. 3.02, in altered form. It explained the need for jurors to find a target crime beyond a reasonable doubt but did not specify which crimes were the “target” ones.
 
 [1]
 
 The court did instruct on the elements of one logical target crime—drawing or exhibiting a firearm against a motor vehicle occupant in a threatening manner (§ 417.3)—al-though this was denoted a crime “lesser” to murder. The court denied a new trial motion brought by Donaghe on this ground, and Donaghe now claims two related due process violations.
 

 First, he claims constitutionally inadequate notice (cf.
 
 People
 
 v.
 
 Lohbauer
 
 (1981) 29 Cal.3d 364 [173 Cal.Rptr. 453, 627 P.2d 183]) of what target
 
 *729
 
 crimes were being asserted since: none were charged; the court did not specify them; and the prosecutor in argument suggested more than one. He claims this prejudicially “ambushed” him (cf.
 
 Sheppard
 
 v.
 
 Rees
 
 (9th Cir. 1989) 909 F.2d 1234). Second, he complains jurors were never instructed to find any particular target crime beyond a reasonable doubt, or to unanimously agree which target crime to use.
 

 Instructions.
 

 We take first the instructional arguments, guided by our Supreme Court’s recent
 
 Prettyman
 
 decision. In supplemental briefing, Donaghe proclaims himself “undisputedly entitled to reversal” under
 
 Prettyman.
 
 The Attorney General does dispute this, however, and so do we.
 

 Prettyman
 
 adopted the
 
 Mouton
 
 rationale with variations. (2) Building on precedent requiring instruction on the predicate felonies for burglary
 
 (People
 
 v.
 
 Failla
 
 (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39]), it declared a sua sponte duty to identify and describe uncharged target crimes, reasoning: “[A]n instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will ‘indulge in unguided speculation’
 
 (People
 
 v.
 
 Failla, supra,
 
 at p. 564) when it applies the law to the evidence adduced at trial.”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 266-267.) Such instruction facilitates “the jury’s task of determining whether the charged crime allegedly committed by the . . . confederate was indeed a natural and probable consequence of any uncharged target crime . . . knowingly and intentionally aided and abetted."
 
 (Id.
 
 at p. 267.) Jurors need not be told they must “unanimously agree on the particular target crime the defendant aided and abetted”; it is enough that each juror find the commission of one or more qualified target offenses.
 
 (Id.
 
 at pp. 267-268.)
 

 The declared sua sponte duty is limited. It arises only when the prosecution has elected to
 
 rely
 
 on the “natural and probable consequences” (hereafter sometimes NPC) theory and the evidence will support instructions on that theory. The court also need not identify
 
 all
 
 potential target offenses supported by the evidence—only those which the prosecution wishes the jury to consider.
 
 (Prettyman, supra,
 
 14 Cal.4th at p. 269.) If a prosecutor requests instruction on the theory without specifying target crimes, the court must inquire which target crimes are desired.
 
 (Id.
 
 at p. 269, fn. 9.)
 

 In
 
 Prettyman,
 
 the NPC doctrine had been mentioned only in the standard language of former CALJIC No. 3.02 but, it was held, no sua sponte duty to identify and describe target crimes arose because the prosecutor had never
 
 *730
 

 relied
 
 on the theory at trial.
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 269-270.) Still, giving the partial instruction without amplification was held to be error, and the question was how to characterize and assess prejudice from the error.
 

 The court discerned no violation of federal due process and thus no basis for finding the error either reversible per se or, if not, harmless beyond a reasonable doubt.
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 270.) The omission was not akin to “
 
 ‘Beeman
 
 error’
 
 [People
 
 v.
 
 Beeman
 
 (1984) 35 Cal.3d 547 (199 Cal.Rptr. 60, 674 P.2d 1318)]—a trial court’s failure to instruct the jury that an aider and abettor must have the specific intent to aid the principal’s crime”
 
 (id.
 
 at p. 271); and the CALJIC instruction had not withdrawn an element from determination, interjected an impermissible presumption into the deliberative process or eliminated the need to find a particular intent
 
 (id.
 
 at pp. 271-272). Rather, the instructions, “which did not identify or describe any target offense, were somewhat ambiguous, because they left open the possibility that the jury might engage in unguided speculation.”
 
 (Id.
 
 at p. 272.)
 

 The court applied the federal test for ambiguity—“ ‘. . . “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way” that violates the Constitution.’ [Citations.]”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 272.) It found no reasonable likelihood of misapplication, “and thus no federal constitutional error”
 
 (ibid.),
 
 because neither party had mentioned the theory in jury arguments, leaving it “highly unlikely” the jury relied on the theory when it convicted the defendant.
 
 (Id.
 
 at p. 273.)
 

 Even if the jury
 
 had
 
 relied on it, the court reasoned, there was still no substantial likelihood of misapplication. Trial evidence showed that the affected defendant, Bray, had encouraged the direct perpetrator, Prettyman, to “ ‘get’ ” the murder victim, Van Camp, just before Prettyman fatally bludgeoned him. “There was no evidence of any other possible ‘target’ apart from Prettyman’s assault on Van Camp, an act that was indisputably criminal. There was no evidence that Bray aided and abetted any noncriminal behavior which led, as a ‘natural and probable consequence’ to Prettyman’s murder of Van Camp, and neither the prosecution nor the defense mentioned any such behavior in their closing arguments to the jury. Under these circumstances, it is unlikely that the trial court’s failure to specify assault with a deadly weapon as a target crime led the jury to misapply the ‘natural and probable consequences’ doctrine by convicting Bray of murder on the theory that she assisted or encouraged some noncriminal target act.”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 273.)
 

 Finally, while the omission did not violate the federal Constitution, it was nonetheless improper under state law, but there was no prejudice under the
 
 *731
 
 state standard
 
 (People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) because it was not reasonably probable the trial outcome would have been different in the absence of the instructional error.
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 274.)
 

 Our case differs from
 
 Prettyman.
 
 First, the prosecutor did rely on, and defense counsel in turn stressed, the NPC doctrine in argument to the jury. Second, the court did instruct in partial compliance with the 1992 revision of CALJIC No. 3.02, an instruction endorsed in
 
 Mouton
 
 as a correct model
 
 {Mouton, supra,
 
 15 Cal.App.4th 1313, 1320) and apparently endorsed in
 
 Prettyman (Prettyman, supra,
 
 14 Cal.4th 248, 264, 268 at fn. 8). These jurors were instructed they had to be satisfied, beyond a reasonable doubt, that the crime the cohort committed was “a natural and probable consequence of the commission of the crime or crimes which were aided and abetted” (fn. 1,
 
 ante).
 
 A special instruction drawn from case law
 
 (People
 
 v.
 
 Rogers
 
 (1985) 172 Cal.App.3d 502, 515, fn. 17 [217 Cal.Rptr. 809]) further defined “ ‘natural’ ” as “in accordance with human nature, not abnormal,” and “ ‘probable’ ” as “ ‘not unlikely’ ” (i.e., as likely). Other instructions fully conveyed the elements of aiding and abetting (CALJIC Nos. 3.00 and 3.01) and, of course, the reasonable doubt standard.
 

 What these instructions primarily failed to do was “identify” which crimes were “potential target offenses . . . the prosecution wishe[d] the jury to consider”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 269, fn. omitted), a flaw similar to the one held in
 
 Prettyman
 
 to have created ambiguity which “left open the possibility that the jury might engage in unguided speculation”
 
 (id.
 
 at p. 272). Target offenses here
 
 were
 
 defined (certainly “described”) by other instructions, which poses a significant difference, but by failing to identify in the revised CALJIC No. 3.02 the specific crimes which were potential target offenses, as opposed to charged or lesser offenses, the court created a similar ambiguity and risk of speculation.
 

 We therefore ask, as in
 
 Prettyman,
 
 if there is a reasonable likelihood “the trial court’s failure to identify and describe potential target crimes caused the jury to
 
 misapply
 
 the doctrine.”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 273.) As the court did in
 
 Prettyman,
 
 we find no such reasonable likelihood because, to tailor the opinion, “[t]here was no evidence [Donaghe] aided and abetted any noncriminal behavior which led, as a ‘natural and probable consequence,’ to [Lucas’s] murder of [Bondoc], and neither the prosecution nor the defense mentioned any such behavior in their closing arguments to the jury.”
 
 {Ibid.)
 

 All of the evidence showed a brandishing or assault. There was no noncriminal act on which jurors might have relied for an NPC finding. Lucas
 
 *732
 
 himself admitted aiming the gun in an effort to scare the red car’s occupants, albeit without intending to fire it, and by all accounts he aimed and fired it quickly after receiving it. No noncriminal act appears, and Donaghe suggests none on appeal.
 

 What he suggests is harm from failing to specify potential crimes since this may have led jurors to rely on different crimes, without unanimity, or choose from a range of crimes, some of which he urges could not have led to murder as a natural and probable consequence. His unanimity point is dashed by
 
 Prettyman,
 
 which expressly declares no need for unanimity. (Prettyman,
 
 supra,
 
 14 Cal.4th 248, 267-268.)
 

 His other point is unpersuasive. The prosecutor stressed just two potential crimes, telling jurors: “Really there [are] only two options there that night: Is he going to brandish it or shoot it[?] So even if Donaghe thought that all Lucas was going to do was brandish it or point it, he is still liable because it is natural and probable that Lucas would have fired the gun.” He then asked jurors to focus on the likelihood Lucas would “shoot” the gun. Actual shooting, if deemed a target crime, was obviously an act the natural and probable consequences of which could be found to be murder. Indeed, jurors may have arrived at second degree murder for Lucas by reasoning that his deliberate act of shooting (they rejected defenses of accident and intoxication) was done in conscious disregard of a known danger to human life, and hence with implied malice. (See CALJIC No. 8.11.) The absence of formal instruction on firearm assault (cf. § 245) caused no conceivable prejudice on these facts; the act of knowingly shooting at another, without justification, was undisputedly criminal.
 

 For any jurors who focused on brandishing as a target offense, the evidence again supports an NPC finding.
 
 [2]
 
 We cannot look to the naked elements of a target crime but must consider the full factual context which the defendant faced.
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 267.) This was a loaded gun, as Donaghe well knew. It was his; he held it; and Williams saw him stick his arm out the window and fire a round into the air shortly before Lucas shot it. Donaghe’s act of passing it to Lucas came after Lucas had taken the gun earlier that day in efforts to confront Janson, and then to rob a Hispanic man. Jurors found true three overt acts by Donaghe, one being that he “gave [Lucas] a gun to use in robbery.” Thus the context already dictated
 
 *733
 
 criminal use of the gun. Now: Lucas said he did not like the way the red car occupants looked at them; he taunted them with fighting words and gestures (Donaghe joining in, witnesses said); and he immediately asked Donaghe to pass him the gun. Whether or not Donaghe knew of Lucas’s having used drugs and alcohol that night, an NPC finding is well supported. Also, any juror who wondered about the elements of “brandishing” had the benefit of instruction on the crime of drawing or exhibiting a gun against a motor vehicle occupant in a threatening manner (§ 417.3; CALJIC No. 9.07 (1992 rev.)), which encompassed all elements of a simple brandishing, and fully applied besides. The circumstance of that offense having been identified in argument as a “lesser” to the murder count should not have kept jurors from looking to it for guidance on target offenses. The instruction itself did not use the word “lesser” or otherwise limit its use.
 

 Building on the flaw that CALJIC No. 3.02, as given, did not specify which crimes were target or nontarget offenses (fn. 1,
 
 ante),
 
 Donaghe postulates jurors may have used any number of other instructionally defined crimes or enhancements, including accessory to murder (identified in instructions as a lesser offense for him), arming and use enhancements, and “entirely unconnected” offenses like robbery, theft or conspiracy. This, we think, insults the jurors’ intelligence. The accessory instruction, for example, plainly told them the requisite concealment or aid had to occur “after a felony has been committed” (CALJIC No. 6.40), which made it impossible for the murder to have been a natural and probable
 
 consequence
 
 of Donaghe’s accessory acts—identified in argument as disposing of the gun and shells afterward. Also self-limiting were the instructions for arming and use enhancements (§§ 12022, subd. (a), 12022.5, subd. (a); CALJIC Nos. 17.15 (1993 rev.) & 17.19 (1993 rev.)), each of which applied only if jurors found guilt of a crime and that there was arming or use at or dining “the commission” of that crime. As for the robbery, theft and conspiracy earlier that day, the ultimate shooting was so far removed in time and purpose that no juror could rationally have found it to be a consequence of the earlier offenses.
 

 Seizing on a suggestion by his own trial counsel in closing that jurors should consider whether shooting was a natural and probable consequence of
 
 carrying a loaded firearm,
 
 and on instruction given on that offense, Donaghe claims no rational juror could have made an NPC finding based on that crime, which is a misdemeanor (§ 12031, subd. (a)(1)). His argument is defeated by its own premise. If a jury reaches a general verdict on more than one factual theory, one or more of which is supported by the evidence and one of which is not, an appellate court will presume, unless the record shows otherwise, the jury acted properly and relied on a supported
 
 *734
 
 theory.
 
 (People
 
 v.
 
 Guiton
 
 (1993) 4 Cal.4th 1116, 1128-1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) The principle applies here where it is urged that an instruction lacking sufficient factual application was given
 
 (id.
 
 at pp. 1129-1130;
 
 People
 
 v.
 
 Harris
 
 (1994) 9 Cal.4th 407, 419, fn. 7 [37 Cal.Rptr.2d 200, 886 P.2d 1193]) and where nothing in the record shows jurors in fact relied on the challenged theory.
 

 This leaves no need to decide the theory’s factual sufficiency on its merits, which we again stress would have to take into account the full circumstances, not just the bare elements of possession. We do observe, however, how unlikely it is any juror would have felt Donaghe passed the gun only for Lucas to hold, not brandish. The remark by defense counsel drew on testimony by Williams, who had said Lucas held the gun in his lap for as long as one or two minutes, at a stoplight, before pointing it out the window. All other witnesses (in both cars) recalled at most seconds elapsing between Lucas getting and firing the gun—an essentially continuous course of action.
 

 That continuity is also the short answer to related contentions focusing again on brandishing and firearm assault as target offenses. Donaghe insists jurors may have (1) impermissibly stacked NPC findings, finding second degree murder a consequence of a shooting and a shooting a consequence of a brandishing. Alternatively, he suggests (2) jurors might have made no link at all to murder, stopping short at a “shooting” or “firing” assault. This he culls from the prosecutor’s argument (quoted more fully above) that the only two options were brandishing or shooting, “So even if Donaghe thought that all Lucas was going to do was brandish it or point it, he is still liable because
 
 it is natural and probable that Lucas would have fired the gun”
 
 (italics added).
 

 We decline Donaghe’s invitation to draw fine distinctions on these facts. By any account, the brandishing-shooting-murder sequence he envisions occurred within seconds in a continuous course of placing the gun under his arm and quickly aiming and firing it. Further, this was not an abstract “shooting”; on the facts, it was a close-range shooting
 
 at
 
 an adjacent occupied car. Thus jurors had to understand the prosecutor’s use of the terms shooting or firing as shorthand for shooting or firing
 
 at a person.
 
 “To trigger application of the ‘natural and probable consequences’ doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed.”
 
 (Prettyman, supra,
 
 14 Cal.4th 248, 269.) The continuous-action sequence here was as close a connection as one is likely to find and posed no risk of jury confusion. Finally, to suggest jurors stopped short of finding an NPC connection to second degree murder is to suggest
 
 *735
 
 they seized on a technical construction of the prosecutor’s words to ignore the central point of the CALJIC No. 3.02 instruction. The presumption that jurors follow instructions
 
 (People
 
 v.
 
 Delgado
 
 (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811]) is not rebutted here.
 

 Appellate counsel for Donaghe insists, post
 
 -Prettyman,
 
 that our case is virtually indistinguishable from
 
 Mouton,
 
 where his same firm was also appellate counsel
 
 (Mouton, supra,
 
 15 Cal.App.4th 1313, 1315), and he therefore urges the same result of reversal. Because
 
 Mouton
 
 was authored by Justice Werdegar and concurred in by Justice Chin, both of whom now sit bn the Supreme Court and recently joined the majority opinion in
 
 Prettyman,
 
 we carefully consider
 
 Mouton.
 

 Mouton
 
 involved a defendant, Irving Mouton, found guilty of second
 
 degree
 
 murder on the prosecution’s theory he had aided and abetted some criminal act the consequences of which were a shooting murder by the direct perpetrator, Raymond Jackson. A boyfriend/girlfriend altercation at an apartment complex had led to arming by two male defenders of the girlfriend, to consequent arming by a group of others (Mouton and Jackson included) who were nervous about the situation and, then, to confrontations at apartment 140, where a party was going on. Jackson, Mouton and a third man, Reed, came to the apartment once, were escorted away and then returned, at which point they were confronted at the door. Jackson and his confronter challenged one another and Jackson opened fire with a gun, killing not the confronter, but one of the revelers inside. There was evidence the group had armed itself earlier that night but no evidence Mouton had personally procured the gun, except an inference from gunshot residue found on his hands.
 
 (Mouton, supra,
 
 15 Cal.App.4th 1313, 1315-1317.)
 

 The prosecutor vaguely argued a group endeavor: “[T]heir ‘target crime’ might have been ‘to carry a concealed weapon, ... to brandish a weapon, to exhibit, to point a weapon, which is also a crime, pointing, assaulting with a deadly weapon, or even to shoot at the apartment at 140 . . . .’ She then argued the ‘shooting was the natural and probable consequence of their plan to make a show of force, to come in with their armed boys to Apartment 140.’”
 
 (Mouton, supra,
 
 15 Cal.App.4th 1313, 1318.) She suggested also “a ‘conspiracy to commit any one of those crimes
 
 (Id.
 
 at p. 1319.) The court gave unrevised CALJIC No. 3.02 and defined no potential target except for assault, which was identified not as a target or even lesser offense, but in the context of whether the direct perpetrator’s actions might have been a justified or less culpable reaction to an assault upon himself.
 
 (Ibid.
 
 & fn. 5.) Failure to define target crimes or explain the need for a reasonable-doubt finding on any such crime was held to be error, particularly
 
 *736
 
 failure to define a supposed intent-to-commit-a-battery component of assault, or an accomplice’s need to assist in that crime with knowledge of the perpetrator’s intent.
 
 (Id.
 
 at p. 1319.)
 
 [3]
 

 Prejudice was found, the court rejecting per se reversal but reasoning, “[W]here, as here, the legal definition of an offense such as assault ‘is not one commonly understood by those familiar with the English language’ [citation], failure to define the offenses may be prejudicial.”
 
 (Mouton, supra,
 
 15 Cal.App.4th 1313, 1320; but see fn. 3,
 
 ante.)
 
 Compounding that error was an argumentative special instruction which had erroneously told jurors they could rely on bogus factors, like failure to aid the victim, to decide whether Mouton had aided and abetted. (15 Cal.App.4th at pp. 1320-1321.) On the former score, prejudice was found in failure to require reasonable-doubt determinations of what the target offenses were, whether any were committed and, if so, whether the murder was a natural and probable consequence.
 
 (Id.
 
 at p. 1321.)
 

 We distinguish
 
 Mouton
 
 in several ways, first, in the nature of the error. The revised CALJIC instruction here, although given in a badly muddled form,
 
 did
 
 tie the reasonable-doubt standard to an NPC finding and to the predicate aided and resulting crimes. Also, there was no related instructional error here to “compound” the problem.
 

 Second, while not described as “target offenses” as such, potential target crimes here were defined, and not in a context relating merely to justified reaction to a victim’s actions, but as offenses one or both defendants might have committed.
 

 Third, on the vital issue of assessing prejudice,
 
 Mouton
 
 did not articulate a reasonable-likelihood-of-misapplication test, as
 
 Prettyman
 
 would. One can argue that
 
 Mouton,
 
 with its somewhat misguided emphasis on the mens rea for assault (fn. 3,
 
 ante),
 
 did not cast the net far enough to snare all available clues whether ambiguity created by the instructional lapse had caused harm.
 
 Mouton
 
 did note the vague range of target offenses suggested in jury argument but made no analysis of other jury findings or evidence.
 
 Prettyman
 
 demands consideration of the full trial in determining whether jurors may have relied on noncriminal behavior.
 

 
 *737
 
 Of course, Mouton's failure to address other jury findings is due to a fourth important distinction; there were none. Nowhere in
 
 Mouton
 
 is the prosecutorial fate of the direct perpetrator Jackson mentioned, and he was not a co-appellant in the case. We take judicial notice of this court’s own records in
 
 Mouton
 
 (Evid. Code, §§ 452, subd. (d), 459, subd. (a)) to confirm what the
 
 Mouton
 
 opinion suggests—accomplice Mouton was tried alone. Thus no jury findings as to the direct perpetrator, Jackson, were available to assist the appellate court in assessing prejudice. We have those findings in this case.
 

 Fifth, the facts supporting aiding and abetting in
 
 Mouton
 
 were less clear than they are here. Mouton’s culpability flowed from running with a group which had armed itself and whose member Jackson eventually did the shooting. Here, Donaghe’s passing of the gun to Lucas in the car is a tangible act of aiding and abetting which was undisputedly criminal. The only issue for jurors was to decide what crime or crimes he knowingly assisted or encouraged, and on the question of knowledge they had his prior criminal activity of that day to consider in the mix.
 

 We find these various differences from
 
 Mouton
 
 sufficient to distinguish the case. The error here was harmless.
 

 Notice.
 

 Modem pleading mies in this state make a general charge of murder sufficient to encompass first and second degree murder, voluntary and involuntary manslaughter, and felony murder.
 
 (People
 
 v.
 
 Thomas
 
 (1987) 43 Cal.3d 818, 824 [239 Cal.Rptr. 307, 740 P.2d 419].) Such expectation and practice has long been held to provide due process notice. “So long as the information adequately alleges murder, the evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution’s theory regarding the manner and degree of killing. [Citation.]”
 
 (Id.
 
 at p. 829, fn. 5.) Likewise, since direct perpetrators and accomplices have long been treated by statute as principals equally liable under the law (§§ 31-32) and since a statute specifies that allegations of principal status suffice to proceed on accomplice theories (§ 971), case law has long held due process notice satisfied as to defendants prosecuted as aiders and abettors
 
 (People
 
 v.
 
 Kennedy
 
 (1953) 116 Cal.App.2d 273, 275-276 [253 P.2d 522]), accessories after the fact
 
 (People
 
 v.
 
 Nolan
 
 (1904) 144 Cal. 75, 79-80 [77 P. 774]) or conspirators
 
 (People
 
 v.
 
 Gallego
 
 (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169]).
 

 Nevertheless, an otherwise proper pleading may in unusual circumstances fail to afford due process notice
 
 (People
 
 v.
 
 Gallego, supra,
 
 52 Cal.3d 115,
 
 *738
 
 189), and Donaghe claims this was the case here. Relying on
 
 Sheppard
 
 v.
 
 Rees, supra,
 
 909 F.2d 1234
 
 (Sheppard),
 
 he claims he was “ambushed” at trial by not knowing until the prosecutor’s jury arguments which potential target crimes he was defending against. In
 
 Sheppard,
 
 the Attorney General conceded a defendant prosecuted on a felony-murder theory had been denied adequate notice and an opportunity to defend where the first mention of reliance on felony murder was made just before jury arguments, the morning after the instructions had been settled without inclusion of felony murder or the predicate felony of robbery, and where the concept of felony murder had not arisen, directly or indirectly, in the taking of testimony. It was conceded by the People that the defendant, despite general adequacy of the pleading, had been affirmatively misled.
 
 (Sheppard, supra,
 
 at pp. 1235-1236.)
 

 Counsel for the Attorney General, representing that he was counsel for Rees on the petition for rehearing which led to that decision, explains that the concession was damage control following a first and ultimately vacated opinion
 
 (Sheppard
 
 v.
 
 Rees
 
 (9th Cir. 1989) 883 F.2d 795) which had threatened to set the federal Ninth Circuit broadly at odds with California’s rule of murder pleading and notice. We acknowledge Court of Appeal cases finding
 
 Sheppard
 
 at variance with binding state Supreme Court precedent
 
 (People
 
 v.
 
 Scott
 
 (1991) 229 Cal.App.3d 707, 717 [280 Cal.Rptr. 274];
 
 People
 
 v.
 
 Crawford
 
 (1990) 224 Cal.App.3d 1, 7-8 [273 Cal.Rptr. 472]) but simply resolve the claim here by distinguishing
 
 Sheppard
 
 factually.
 

 California and Ninth Circuit decisions have uniformly viewed
 
 Sheppard
 
 narrowly and limited it to its facts. Thus, for example, no “ ‘ambush’ ” occurs where felony-murder instructions are mentioned for the first time at an initial instructions conference, so long as trial evidence supports the theory and the defense has a day or more to prepare oral argument.
 
 (Morrison
 
 v.
 
 Estelle
 
 (9th Cir. 1992) 981 F.2d 425, 428;
 
 Stephens
 
 v.
 
 Borg
 
 (9th Cir. 1995) 59 F.3d 932, 935-936;
 
 People
 
 v.
 
 Gallego, supra,
 
 52 Cal.3d 115, 189.)
 

 Donaghe cannot say he lacked notice of an aiding and abetting theory. Four days before jury selection, the prosecutor proposed aiding and abetting instructions which included the NPC theory (CALJIC Nos. 3.00-3.04), and the trial evidence then showed without dispute it was Lucas, not he, who pulled the trigger in the killing. Donaghe’s complaint is that the prosecutor did not propose any particular target crime until jury argument, thus assertedly making it difficult to prepare his defense.
 

 We reject the claim. Whether the target crime be denominated brandishing, assault or any other crime which might logically lead to an NPC finding, the
 
 conduct
 
 forming the factual basis for an NPC finding was crystal clear:
 
 *739
 
 Donaghe passed Lucas the gun inside the car just before Lucas fatally shot Bondoc. The range of potential offenses was in no way mysterious. Tellingly, and unlike the defense counsel in
 
 Sheppard
 
 who strenuously protested his surprise at a newly introduced felony-murder theory
 
 (Sheppard, supra,
 
 909 F.2d 1234, 1235-1236), defense counsel here raised no claim of surprise whatsoever (cf.
 
 People
 
 v.
 
 Scott, supra,
 
 229 Cal.App.3d 707, 717). Not even in his motion for new trial, where he urged
 
 Mouton
 
 error, did counsel claim surprise.
 
 [4]
 

 Heat of passion instruction
 

 The court instructed on involuntary manslaughter as to Lucas but refüsed his request for instruction on heat-of-passion voluntary manslaughter. Lucas urges error in that a juror could reasonably have found he intentionally shot the gun due to a “sudden quarrel” arising from occupants of the red car having smirked and given him dirty looks. We see no error. The “reasonable person” marks the standard for assessing provocation
 
 (People
 
 v.
 
 Wickersham
 
 (1982) 32 Cal.3d 307, 326-327 [185 Cal.Rptr. 436, 650 P.2d 311]), and the evidence, viewed most favorably to the defense
 
 (People
 
 v.
 
 Flannel
 
 (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]), showed nothing adequate to provoke a reasonable person to shoot.
 

 Lucas testified the driver laughed and a backseat passenger “smirked” and looked at him “real dirty, like he wanted to fight or something.” An acquaintance testified Lucas told him later the occupants of the car “were yelling out names, telling them to pull over” and that he had shot “because they were dogging him and they wanted him to pull over.” Lucas also relies on his drug-affected state. He testified he would “get real paranoid” after a couple of days of methamphetamine use, and resulting muscle tension and sleep loss, and had been using the drug heavily (along with marijuana and alcohol) for several days before the shooting, sleeping little if at all. When he fired, he was “paranoid,” “confused” and “got mad”: “[I]t was kind of emotions going through me. My mind was just racing so hard, you know. I don’t—I couldn’t say exactly what I was thinking.”
 

 Assuming jurors might have accepted Lucas’s claim of getting “mad,” they could not have rationally found that a
 
 reasonable person
 
 in the circumstances would have been provoked to shoot—certainly without evidence of what provocative “names” the car’s occupants may have been yelling (e.g.,
 
 People
 
 v.
 
 McCowan
 
 (1986) 182 Cal.App.3d 1, 8, 15 [227 Cal.Rptr. 23]
 
 *740
 
 [victim had made an “obscene gesture”]). “Dogging,” according to Long’s testimony, means looking “hard” or “[j]ust stonefaced”—and may be “intimidating” in some circles. However, even if intimidating, this alone could not be deemed enough, on this evidence, to provoke a reasonable person to shoot someone. As for intoxication or paranoia, those are conditions incompatible with the reasonable-person standard.
 

 Victim election for conspiracy to rob
 

 Count 2 of the information alleged conspiracy to rob but named no victim, and count 3 alleged robbery but fictitiously named the victim “John Doe.” Each defendant seeks reversal of his conspiracy-to-rob conviction, claiming the prosecutor failed to elect whether the victim on that count was Adam Janson, whom they sought but never located, or instead the unnamed Hispanic drug dealer they actually robbed. They fear jurors may have been confused and thus failed to unanimously agree who the victim was (cf.
 
 People
 
 v.
 
 Beardslee
 
 (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311]). We hold a clear enough election was made.
 

 In all respects but one, the arguments of counsel clearly identified Janson as the conspiracy victim. In going over the overt acts alleged for count 2, the prosecutor began, “[W]hat we are dealing with here is the conspiracy to rob Adam Janson,” and then spoke of the plan and efforts to find and rob him. He went on to differentiate count 3, saying, “[B]y the way, this has to do with the incident involving the Hispanic male. . . .” Consistently, Donaghe’s counsel said of count 2, “that was the conspiracy as to Adam,” and then argued against the overt acts in that context. The only question arises in the prosecutor’s closing argument, where he said at one transition point: “With regards to Bill Long and Chuck Williams, and the conspiracy to commit robbery in the robbery of the drug dealer, first of all, the law does not require proof of the name of the victim or anything like that. The law only requires the type of evidence that you have heard.”
 

 Defendants see a blundering reference to the unnamed Hispanic drug dealer; the Attorney General sees a mistranscription (the third “and” erroneously transcribed “in”) plus a proper reference to unnamed
 
 coconspirators
 
 alleged in count 2. Whichever it is, however, we see no chance of ultimate jury confusion. The arguments clearly related the conspiracy to the plan to rob Janson, and the findings of overt acts for that count made no sense if applied to the Hispanic man. Jurors found as to each defendant: “[Lucas] asked [Donaghe] if he had brought his gun”; “[Donaghe] gave [Lucas] a gun to use in robbery”; and “[Lucas] and [Donaghe] drove to various locations looking for their planned robbery victim.” Together, those findings could
 
 *741
 
 logically apply only to Janson. It was he whom defendants initially set out to rob and then drove around in search of, stopping various places, and Lucas’s query whether Donaghe had brought his gun came at the start of that search, before anyone suggested looking for another dealer. The jury must have known the object of the conspiracy was Janson, not the Hispanic man.
 

 Conspiracy evidence
 

 Assuming Janson was the object of the conspiracy, each defendant claims insufficient evidence to support his conviction on that count. Substantial evidence is our review standard
 
 (People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), and the component findings here are that each defendant (1) intended to agree or conspire and (2) intended to commit the robbery of Janson
 
 (People
 
 v.
 
 Backus
 
 (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837]; § 182, subd. (a)). Such intents may be inferred from the circumstances connected with the offense. (§ 21, subd. (a); cf.
 
 People
 
 v.
 
 Johnson
 
 (1972) 28 Cal.App.3d 653, 657 [104 Cal.Rptr. 807] [intent for attempted robbery].)
 

 Driver William Long provided the strongest evidence. While largely unable to recall exactly what was said and while conceding lack of an express verbal agreement, he did recall a discussion at 245 Poplar, after picking Donaghe up that afternoon,
 
 [5]
 
 which led to a “spontaneous thing” to go out driving, look for Janson and take his drugs and money. All eventual participants were there, although Donaghe was not “really involved into [the] conversation.” Word had “gotten around,” and Lucas “found out that Adam had drugs or money and wanted to get the drugs or the money.” He was going to “take them.” Lucas said, “Let’s go find Adam,” and this had clear implicit meaning for Long. “It was the way it came about, ... he made it clear, whether he said it or not, that was what the issue was, that we were to go find him and get him for his money or his drugs.”
 

 Lucas himself provided evidence for a possibly earlier agreement time. He said that he, Long and Williams decided to buy marijuana from Janson. Not intending to rob him but not trusting him either, Lucas wanted to be armed and so telephoned Donaghe to ask him to bring a gun. Fearing Donaghe would not let him use it just to buy marijuana, Lucas falsely told him they were going to
 
 rob
 
 Janson. Donaghe was “real hesitant” but agreed. The three then drove to Donaghe’s and picked him up. Donaghe came out to the car
 
 *742
 
 with the gun wrapped in a sweatshirt. Lucas asked if he had it, and Donaghe said, “Yeah.” We infer in support of the verdict
 
 (People
 
 v.
 
 Johnson, supra,
 
 26 Cal.3d 557, 576), and against defendants’ theory of withdrawal from the conspiracy, jurors rejected Lucas’s story of never intending a robbery and of telling Donaghe, when he got in, they were not going to rob Janson but just buy “weed” from him.
 

 Corroboration for the gun inquiry came from passenger Williams. When they stopped for Donaghe, he recalled, Donaghe came to the car carrying a hooded sweatshirt. Lucas asked, “Do you have it?” and Donaghe said, “Yeah.” (Williams testified he did not know until later that “it” was a gun.) Jurors surely credited that account, for they found, as an overt act, “[Lucas] asked [Donaghe] if he had brought his gun.” They also found: “[Donaghe] gave [Lucas] a gun to use in robbery”; and the two “drove to various locations looking for their planned robbery victim.” Those findings are amply supported. Lucas got the gun from Donaghe and tucked it into his waist when he got out of the car and went to find Janson at a girlfriend’s house (Williams so testified and Lucas admitted going twice), and Lucas and Donaghe proceeded together to several locations.
 

 The conspiracy evidence is substantial for both defendants. Jurors could properly credit testimony in part
 
 (People
 
 v.
 
 Maxwell
 
 (1979) 94 Cal.App.3d 562, 576 [156 Cal.Rptr. 630]), infer intent from the circumstances without finding an express agreement
 
 (People
 
 v.
 
 Cooks
 
 (1983) 141 Cal.App.3d 224, 311 [190 Cal.Rptr. 211]) and rely on the found-true overt acts
 
 (id.
 
 at p. 313).
 

 Conspiracy firearm use
 

 Jurors found true allegations of firearm “use” (former § 12022.5, subd. (a)) for both defendants in the commission of the count 2 conspiracy to rob. Defendants see insufficient evidence of firearm “use,” as opposed to mere possession or “potential” use during the conspiracy, and so they assail the use findings as unsupported. The Attorney General sees the issue as moot because the prosecutor conceded lack of use at sentencing and suggested each finding be reduced to simple arming (§ 12022, subd. (a)(1)). The court followed the suggestion, imposing one-year (rather than three-to-five year) terms for each defendant. For Lucas, the court granted a motion to amend the information; for Donaghe, who was sentenced separately, it appears no amendment was sought. The abstract of judgment for Lucas correctly shows the lesser enhancement, but the abstract for Donaghe, while showing a reduced, one-year term, still reads “12022.5(A).” The Attorney General urges us to amend the abstract for Donaghe and affirm.
 

 Not so fast, says Lucas, whose trial counsel objected to the amendment as unauthorized and a usurpation of jury function. Lucas echoes the refrain
 
 *743
 
 here, claiming a denial of due process notice and an unconstitutional deprivation of a jury determination. He deems striking the only remedy.
 

 We find authority for the reduction in
 
 People
 
 v.
 
 Strickland
 
 (1974) 11 Cal.3d 946 [114 Cal.Rptr. 632, 523 P.2d 672] (Strickland). The murder-trial defendant in
 
 Strickland
 
 was charged with firearm use under provisions of former section 12022.5, a charge which the jury found true, but he did not fall within the statute because it then applied only to six enumerated felonies. Murder was among them, but the jury had found him guilty of the lesser offense of voluntary manslaughter, which was not enumerated. (11 Cal.3d at pp. 959-961.) Nevertheless, the court held him subject to an uncharged “arming” enhancement under provisions of former section 12022 applicable to deadly weapons (now § 12022, subd. (b)(1)) and all felonies: “[. . . \ . . [S]ection 12022 is not a lesser included offense under 12022.5 but section 12022 would be applicable in any case in which 12022.5 applies. Basically 12022.5 is a limited application of section 12022 with a heavier penalty. In the present case appellant did not come within the provisions of section 12022.5, as the crime of which he was convicted was not specified in that section, but the jury did find that he used and thus was armed with a firearm, a shotgun, at the time the offense was committed. Appellant was charged in the commission with the use of a firearm under section 12022.5, [and] thus had notice that his conduct [could] also be in violation of section 12022.’]” (Strickland,
 
 supra,
 
 at p. 961, quoting
 
 People
 
 v.
 
 Provencher
 
 (1973) 33 Cal.App.3d 546, 550 [108 Cal.Rptr. 792], bracketed “and” added.)
 

 Like reasoning applies here. The versions of the sections operative in 1993 were worded alike as applied to firearm use or arming during the commission of a felony. The sole difference was vicarious-arming language found only in section 12022, but neither defendant can complain. The jury, by its overt-act findings, found the conspiracy was ongoing from the time Lucas asked Donaghe if he brought the gun, through the time they traveled together to various locations in search of Janson. At different points during that time—the evidence shows and the jury by its “use” finding necessarily found—each defendant was personally armed with the gun. This temporary possession was enough.
 
 (People
 
 v.
 
 Bland
 
 (1995) 10 Cal.4th 991, 999-1003 [43 Cal.Rptr.2d 77, 898 P.2d 391].) The prosecutor’s concession of no “use”, (on which we need express no opinion) was based not on either defendant’s lack of personal possession, but on his perceived lack of more active “use” of the weapon during that time (see generally,
 
 People
 
 v.
 
 Granado
 
 (1996) 49 Cal.App.4th 317, 321-325 [56 Cal.Rptr.2d 636], review den. Jan. 15, 1997; see also
 
 People
 
 v.
 
 Masbruch
 
 (1996) 13 Cal.4th 1001, 1006-1014 [55 Cal.Rptr.2d 760, 920 P.2d 705]).
 

 The lesser enhancement having been properly ordered for each defendant, we will simply order Donaghe’s abstract of judgment amended to show the correct code section.
 

 
 *744
 

 Robbery evidence and use
 

 Both defendants challenge the Hispanic dealer (count 3) robbery. Lucas argues a lack of force or fear, only a driving off with marijuana without paying, and seeks a reduction to theft. Donaghe argues likewise, adding there is no evidence he knew of Lucas’s intent to rob so as to support aiding and abetting through giving Lucas the gun. Lucas also attacks his use enhancement on that count (Donaghe was not so charged), disputing he “used” the gun.
 

 The evidence, viewed most favorably to the verdict, showed defendants arming themselves in a conspiracy to locate and rob drug dealer Janson of marijuana and/or cash. Donaghe handed Lucas the gun to use in the endeavor. Unable to find him after traveling together and inquiring at several likely locations, and with dusk approaching, defendants ceased those efforts. Somebody in the car brought up the idea of getting marijuana from someone else, and they drove to an area of Redwood City “down over by the Boy’s Club on Spring Street,” a residential area where they knew marijuana was sold.
 

 Arriving in the area, they pulled up to a group of people standing out on a street comer and asked if they knew where they could “get any weed.” Someone directed them to go “right down the street to some guy that was standing out there” in front of a house. Long did a U-tum and pulled the car up to the man on the passenger side. Lucas asked him where to get some “weed,” and the man replied he only had a “dime bag,” meaning an amount costing $10. The man handed Lucas a tinfoil packet through the window, and Lucas opened it and looked inside.
 

 Long and Lucas differed in their accounts of what happened next. Long testified Lucas “brandished” the gun, holding it above his lap in his left hand, below “the level of the door handle or frame,” and pointed “towards,” though not directly at, the man. Lucas “showed him the gun” in this manner and said, “This is me,” meaning “This is mine” or “This weed is mine.” The man, who stood “right next to the car,” “ducked off the side real quick [and] jumped onto the sidewalk,” “trying to get away from the car.” When Long heard someone say “go” or “drive,” he drove away fast. According to Lucas, the plan was for Long to drive away without them paying if the marijuana was no good. He took the packet, showed it to the others and, when Long failed to drive off, got nervous as the Hispanic man grew impatient. Lucas had the gun between the front seats. He lifted it toward his lap, but only to look for a $20 bill he had there. The next thing he knew, the man “was gone” and Long “just drove off.” Looking back, Lucas saw the man “laughing like, you got me, you got me.”
 

 
 *745
 
 Obviously, the jury was entitled to discredit Lucas’s version of innocent gun display and the man’s riant reaction. Nevertheless, defendants dispute whether Long’s more inculpatory version was enough to establish firearm use or a taking by force or fear.
 

 We resolve first the issue of “use” for Lucas’s enhancement, for whether Lucas aimed the gun at the man or really succeeded in frightening him, the use bore a sufficient facilitative nexus to the robbery’s commission to suffice. We recently clarified the point: “[I]f the defendant is found on substantial evidence to have displayed a firearm in order to facilitate the commission of an underlying crime, a use of the gun has occurred both as a matter of plain English and of carrying out the intent of section 12022.5(a). Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5(a).”
 
 (People
 
 v.
 
 Granado, supra,
 
 49 Cal.App.4th 317, 325.) The case Lucas cites as contrary authority
 
 (People
 
 v.
 
 Funtanilla
 
 (1991) 1 Cal.App.4th 326, 331 [1 Cal.Rptr.2d 875]) has now been examined on this point and found wanting
 
 (People
 
 v.
 
 Masbruch, supra,
 
 13 Cal.4th 1001, 1007-1012). Display of the gun here, under Long’s version, could be found not incidental or inadvertent, and the jury could reasonably find the enhancement true.
 

 The enhancement aside, the underlying robbery had to be accomplished by force or fear (§ 211), meaning, on this evidence, the victim had to fear some unlawful injury (§ 212). Again, under Long’s less innocent account
 
 (ante)
 
 the jury could reasonably so find, and this only further supports the use finding. Long described a fearful retreat from the side of the car as soon as Lucas brandished the gun and aimed it toward the window.
 

 The remaining question affects only Donaghe, and the question is whether he had knowledge of Lucas’s unlawful intent when he handed him the gun.
 
 (People
 
 v.
 
 Beeman, supra,
 
 35 Cal.3d 547, 560.) Lucas denied getting the gun just then, saying he had kept it at his side after getting it from Donaghe earlier in the day. The jury necessarily rejected that testimony. The remaining testimony came from Long, who testified there was a discussion in the car that Lucas was going to take the marijuana from the Hispanic man and that Donaghe passed his gun to Lucas before they stopped by the man. The difficulty is, Long’s testimony leaves it unclear whether the gun passing
 
 *746
 
 followed or preceded the discussion. He said taking the marijuana by brandishing the gun was discussed “[r]ight as we got there, before we got there,” and that everyone knew this when they “pulled up to the Mexican individuals . . . .” Long did not recall seeing Donaghe give Lucas the gun “as part of this discussion” about “stealing the marijuana,” but he did recall seeing Donaghe pass it “before the robbery”—“[bjefore we approached” the man to ask for weed. Donaghe passed the gun “just before, minutes before, the incident” with the man.
 

 Although the sequence was left ambiguous, we conclude the jury had enough to infer knowledge of Lucas’s intent from the broader circumstances. The discussion and passing evidently came about very close in time, “minutes” before the robbery. By then, the foursome had driven to that neighborhood after discussing where to “get” marijuana. Jurors could infer a situation similar to the testimony about the conspiracy to rob, where Long said that Lucas declaring, “Let’s go find Adam,” clearly implied to him an intent to rob. Jurors heard Long testify he had no money himself and did not recall anyone having or giving anyone money with which to buy marijuana. According to Long, Donaghe had earlier given Lucas the gun just before stopping places to find Janson and had returned it right afterward. The clear inference from that pattern was that Donaghe gave Lucas the gun right when he was preparing to use it, and got it back right afterward.
 
 [6]
 
 There was no evidence Lucas was afraid of the Hispanic man or had any innocent purpose for having the gun just then. We hold the jury could rationally infer from the total circumstances a knowledge of Lucas’s intent to rob when Donaghe passed him the gun, even if it felt unsure whether the passing took place just before or after the specific discussion of stealing from the man.
 

 Spill-over harm
 

 Confident he has shown errors of constitutional dimension regarding his murder conviction, Donaghe urges that such error infected the entire trial, requiring reversal of the conspiracy and robbery counts, too. However,
 
 Prettyman
 
 error is the sole error here and was harmless. This sufficiently distinguishes his cited authority
 
 (Price
 
 v.
 
 Georgia
 
 (1970) 398 U.S. 323, 329-331 [90 S.Ct. 1757, 1761-1762, 26 L.Ed.2d 300]).
 

 Disposition
 

 The judgment is affirmed as to both defendants. For clarity, the superior court shall in Donaghe’s case direct the preparation, and forwarding to the
 
 *747
 
 proper authority, of an amended abstracted of judgment reflecting that Donaghe’s one-year enhancement on the count 2 conspiracy to commit robbery is pursuant to section 12022, subdivision (a)(1).
 

 Kline, P. J., and Haerle, J., concurred.
 

 A petition for a rehearing was denied July 7, 1997, and appellants’ petitions for review by the Supreme Court were denied September 24, 1997.
 

 [1]
 

 As delivered orally, CALJIC No. 3.02 instructed: “One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crimes committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted. [¶] . . . [¶] If you find the defendant Donaghe guilty of any crime charged, or any lesser crime thereunder, you must be satisfied beyond a reasonable doubt: HU One, that the crime or crimes were committed; HD Two, the defendant aided and abetted such crime or crimes; ['ll] Three, a co-principal in such crime committed the crime or crimes; HD And, four, the crimes committed was a natural and probable consequence of the commission of the crime or crimes which were aided and abetted.” The charge did not specify particular crimes and charges as envisioned in the instruction.
 

 The unaltered CALJIC No. 302 (6th ed.) currently reads as follows (brackets, parentheses and blanks in original): “One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [1 In order to find the defendant guilty of the crime[s] of _, [as charged in Count[s]_,] you must be satisfied beyond a reasonable doubt that: HD 1. The crime [or crimes] of_[was] [were] committed; HD 2. That the defendant aided and abetted [that] [those] crime[s]; HD 3. That a co-principal in that crime committed the crime[s] of_; and HO (4) The crime[s] of_ [was] [were] a natural and probable consequence of the commission of the crime[s] of_.”
 

 [2]
 

 For a contrary argument, Donaghe calculates from State Department of Justice statistics a statewide “probability” that only 5.8 to 6.4 percent of assaults with firearms lead to murder. His effort fails. Whether one offense is a natural and probable consequence of another depends on a consideration of the full factual context the defendant faced (e.g.,
 
 Prettyman, supra,
 
 14 Cal.4th 248, 267), something which mere statistics based on charges or actual convictions cannot possibly reflect.
 

 [3]
 

 Mouton
 
 was decided before the Supreme Court clarified that assault does not require any goal-directed intent to harm another but, rather, only a willfully committed act which by its nature would probably and directly result in the application of physical force on another.
 
 (People
 
 v.
 
 Colantuono
 
 (1994) 7 Cal.4th 206, 213-218 [26 Cal.Rptr.2d 908, 865 P.2d 704].) This clarification could have affected the assessment of prejudice in
 
 Mouton,
 
 which mistakenly stressed that assault required an “intent to commit a battery” and thus had a legal definition not commonly understood by jurors.
 
 (Mouton, supra,
 
 15 Cal.App.4th 1313, 1319-1320.)
 

 [4]
 

 Lucas offers a mindless “me too” to every argument Donaghe raises, whether applicable to him or not. Here, for example, Lucas’s own liability was direct, not derivative, making target-crime issues irrelevant, yet he purports to “join” in Donaghe’s arguments.
 

 [5]
 

 Long at one point testified “I don’t recall” when asked if the conversation at 245 Poplar was before or after they picked up Donaghe. In the next breath, however, he said “Yes” when asked if he did recall, “at some point,” he was “at the house at 245 Poplar and discussed with both defendants robbing Adam.” We assume in support of the verdict that jurors resolved this conflict against defendants.
 

 [6]
 

 Had the later murder been an ««charged act, it probably would have been admissible as subsequent conduct showing a common design or plan, given the similarity of passing the gun just before an offense, and other circumstances.
 
 (People
 
 v.
 
 Balcom
 
 (1994) 7 Cal.4th 414, 425-426 [27 Cal.Rptr.2d 666, 867 P.2d 777].) It follows, it was likewise probative as a charged offense.