Filed 5/21/14  P. v. Duenas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C070823 |
| Plaintiff and Respondent, | (Super. Ct. No. SF116082A) |
| v. | |
| NOAH EUGENE DUENAS, | |
| Defendant and Appellant. | |

A jury found defendant Noah Eugene Duenas guilty of the first degree murder of Jose Lua, and found that defendant personally and intentionally discharged a firearm, causing Lua's death.  (Pen. Code, §§ 187, 12022.53, subd. (d).)[1]  The jury also found defendant guilty of shooting from an occupied vehicle and unlawfully possessing a

_____

[1] Further undesignated statutory references are to the Penal Code.

1

firearm as a minor.  (§§ 246, 12101, subd. (a)(1).)  The trial court sentenced defendant to 50 years to life in prison, and defendant timely filed this appeal.

On appeal, defendant first contends insufficient evidence supports the jury's findings of premeditation and deliberation.  He further claims the trial court erred in failing to instruct the jury on provocation, as well as in instructing on concealing evidence.  He argues his sentence is unconstitutional, and identifies an error in the abstract of judgment.  As we will explain, we agree with only the last point.  We will affirm but direct the trial court to prepare a corrected abstract of judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*People's Case*

Defendant shot the victim, Jose "Boo" Lua, in the head on the evening of March 18, 2010, as he was speaking with Lua, who sat belted in the passenger seat of a parked car at a liquor store.  One witness testified he saw Lua roll the window down of the car as defendant approached and then he saw defendant speaking amicably to Lua for about five minutes, with no indication of anger, yelling, or swearing.  The conversation ended abruptly when defendant shot Lua once, and then "took off like a banshee" on a push scooter.  Lua's girlfriend, who was with him that night but was in the store during the shooting, had never seen Lua with a weapon.  After the shooting, she left the store, saw Lua bleeding and tried to help him, and then, according to other witnesses, started screaming for help.

A trained EMT happened upon the scene.  He saw a distraught women being held by two people, saw Lua, radioed for help because he did not have his medical kit with him, cut Lua free from his seat belt and tried to keep his airway open until help could arrive.  During this period, no one else approached the car.  The EMT saw no gun.

A deputy sheriff on patrol heard the shot and screaming and arrived at the scene just as a radio dispatch went out.  He found Lua had a pulse, radioed for medical help, and kept everyone away from the car until help arrived.  He saw no gun, nor did another

2

officer who accompanied Lua to the hospital and took charge of his clothing and effects. Two other officers searched the entire car and found an expended .32-caliber cartridge casing near the right front passenger seat, but found no weapons. They did find two mobile telephones and a baggie of what appeared to be prescription pills.

A .32-caliber bullet had entered Lua's right cheek, and the gun muzzle was between one foot and two feet away from the skin when it was fired. The gun was to the right and forward of the head, because the bullet traveled down and back and Lua may have been bent over when he was shot. Lua was not under the influence of alcohol or drugs.

Defendant fled the scene but was found in October 2010 in jail in Alameda County, where he had been booked under a false name.

*Defendant's Case*

Defendant testified he shot Lua in self-defense. He had known Lua as a friend in the past, but had lost contact with him, and had no "beefs" or fights with him and no reason for defendant to shoot Lua, nor was there any reason for Lua to shoot defendant. Defendant had been in trouble at school for non-gang graffiti and throwing a pizza at someone, which is why he had gone to an alternative school. He had been in some fights when he was younger, 11 or 12 years old, and had served some time in juvenile hall and had been put on probation for the graffiti. He was a week shy of 18 at the time of the killing. Defendant denied he was a gang member, but testified had been shot at during a party in October 2009 and bought the gun in December 2009 and began carrying it loaded--where he could easily access it--because he was scared, although he sometimes hid it under a porch. It was in his waistband while he was at the store.

As defendant passed by the car, Lua called out to him. After they spoke in a friendly manner, Lua "confronted" defendant about an incident that "involved my aunt's house being broken into." Specifically, Lua said " 'What's this shit I hear about your aunt accusing me of breaking into her house?' " Defendant replied that he did not know.

3

He knew his aunt's house had been broken into a couple of years before, but did not know who had done it. Lua replied, " 'Fuck that. Fuck that nasty bitch' " and " 'that bitch don't know what she's talking about.' " He added, " 'Fuck her and fuck you.' " Defendant could have walked away, but chose to stay. Then Lua said: " 'What? What? You want some of this?' " Lua began to reach or bend down, and based on Lua's "whole demeanor, how he was looking at me, his tone of voice, I mean everything," defendant testified he "thought [Lua] was going for like a gun or something. So I grabbed my pistol and I had shot and I ran away." "I just reacted. I didn't aim." He knew he had shot Lua, but he did not turn himself in because he was scared. When he was arrested in Oakland he gave a false name--actually, two different false names--"to buy some time" because he had already been working with an aunt to get an attorney so he could surrender. He left the gun in Stockton because he was scared, but he could not remember where. When questioned in jail about the killing, he denied being at the store because he wanted to talk to his attorney first, although he spoke to the officer after waiving his rights.

One of defendant's former teachers testified she thought "he was calm, peaceful, non-violent, a leader" and someone she could rely on. On cross-examination, she testified her opinion would not change if she heard he had attacked students or engaged in fights several times in 2004 and 2005. Defendant's great-aunt testified he lived with her from 1998 to 2007 (defendant described her as a "mother figure"), and in her opinion he was "not violent. He's very peaceful." On cross-examination, she testified she had not learned of incidents of school violence involving defendant in 2004 and 2005, but, as his caregiver, the school would have contacted her in the event of any issues.

*Argument*

The prosecutor argued that although the motive was inexplicable, defendant lulled Lua into a sense of complacency by speaking with him, then suddenly shot Lua in the head once, at close range, "a really purposeful, intentional shot in a specific area that he knew would be successful," while Lua remained in the car, belted into his seat, unable to

4

escape.  According to the prosecutor, defendant lied about what Lua said, but even if Lua had looked at defendant threateningly and spoke ill of his aunt, those events did not justify murder.

Defense counsel argued defendant fired the gun to save his life, and even if he acted unreasonably, that lessened his crime to voluntary manslaughter.  He emphasized that it was the People's burden to disprove self-defense, and they carried the burden to prove the charges all the way up to first degree murder.  He also suggested there had been time for defendant's girlfriend to dispose of any weapon that Lua had that night.  Counsel conceded guilt on the misdemeanor firearm possession charge.

## DISCUSSION

### I

### *Premeditation and Deliberation*

Defendant contends no substantial evidence supports the jury's conclusion that he committed the murder with premeditation and deliberation.  We disagree.  Viewing the manner and circumstances of the killing in the light favorable to the verdict, we find substantial evidence in the record to support that verdict.

> "When considering a challenge to the sufficiency of the evidence to support a criminal conviction, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citations.]

> "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'  [Citations.]  The process of premeditation and deliberation does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' "
> (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 (*Mayfield*); see *People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069 (*Mendoza*).)

5

Our Supreme Court has stated: "In *People v. Anderson* (1968) 70 Cal.2d 15 [], we identified three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. [Citation.] We have made clear, however, that ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." ' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.)

In this case, the jury could rationally conclude that defendant approached Lua and engaged him in a benign discussion to lull him into a sense of security, and then drew his pistol and fired one fatal shot directly into Lua's head. The mechanics of the killing, a single shot to the head at close range, suggest deliberation. Approaching Lua with a concealed firearm and drawing it during an unremarkable conversation, while Lua was belted into his seat, suggests premeditation. Although, as the prosecutor conceded in argument, the evidence failed to show defendant's subjective motive for killing Lua, the evidence of planning and manner of killing is sufficient to support the verdict. (See, e.g., *Mayfield*, *supra*, 14 Cal.4th at p. 768 ["The shot was fired at [the victim's] face, which is consistent with a preexisting intent to kill"].) Proof of the defendant's actual motive is not required. "A senseless, random, but premeditated, killing supports a verdict of first degree murder." (*People v. Edwards* (1991) 54 Cal.3d 787, 814 [Edwards drove past two victims, stopped and spoke to get their attention, and shot both in the head].)

Thus we conclude the evidence is sufficient to support the jury's verdict, given the manner and circumstances of the killing.

II

*Voluntary Manslaughter Instruction*

Defendant contends his testimony that Lua called his aunt a "nasty bitch" and said "[f]uck her and fuck you" provided sufficient evidence to warrant instruction on

6

voluntary manslaughter based on a sudden quarrel or heat of passion. We are not persuaded.

A.   *Background*

Defendant requested instruction on heat of passion manslaughter. The prosecutor objected that there was insufficient evidence to require the instruction, first arguing that words were insufficient to show provocation, then that defendant testified "he didn't feel anything; he was not affected by the stares, he was not affected by the words. [¶] The only reason he acted was as a result of the actions by the victim and not as a result of the words that were spoken to him [by] the victim." Defense counsel argued defendant's fearfulness created a hybrid situation in which both provocation and perfect or imperfect self-defense could be argued.[2]

_____

[2] The requested instruction, CALCRIM No. 570, provides in pertinent part that: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation . . . . While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

The trial court refused to give the requested instruction, stating: "I think your client was clear . . . it was self-defense. He wasn't provoked. He wasn't angry. He was scared, which goes to the self-defense, but" not to provocation. "I don't believe the conversation that your client had with the victim rises to provocation."

B.      *Law and Analysis*

One form of manslaughter is an unlawful killing "upon a sudden quarrel or heat of passion." (§ 192, subd. (a); see *id*. § 188 [malice may be implied "when no considerable provocation appears"].) Even when a person premeditates a killing, "the law acts out of forebearance for the weakness of human nature and, where sufficient facts are shown, will disregard the actual deliberate and malicious intent and reduce the crime to manslaughter." (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 823; see *People v. Rios* (2000) 23 Cal.4th 450, 460-462; *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1478 [finding provocation means "defendant's behavior, while still reprehensible, is an understandable product of common human weakness, and therefore partly excusable"].) Our Supreme Court recently clarified that the provocation must be sufficient to cause a reasonable person *to act rashly*, rather than to kill. (*People v. Beltran* (2013) 56 Cal.4th 935, 938-939, 949-950 (*Beltran*).)

---

"It is not enough that defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[¶] . . . [¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

8

A defendant is generally entitled to instructions on a theory of defense only if that theory is supported by substantial evidence. (*People v Souza* (2012) 54 Cal.4th 90, 115-116; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [as applied to provocation].) Here, no evidence supports the notion that defendant acted out of passion when he shot Lua in the head at close range. There was no evidence defendant acted rashly or that his judgment was impaired. He testified that he acted as he did because he discerned a threat based on Lua's demeanor and movements. This is evidence of judgment, not passion, and it is not evidence that defendant was provoked. (See *People v. Moye* (2009) 47 Cal.4th 537, 552-554 [Moye testified victim's actions caused him to act in self-defense, not out of lack of judgment]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585 (*Manriquez*) ["no showing [Manriquez] exhibited anger, fury, or rage'" when he acted].)

Even if there were evidence supporting the notion that defendant was provoked, no evidence supports the additional requirement of the heat of passion defense--that any such provocation be objectively reasonable. As we explain *post*, even assuming the jury believed defendant's testimony that Lua verbally disparaged him and his aunt, Lua's verbal acts were clearly insufficient to cause a reasonable person to act without judgment, as the defense requires. Thus the heat of passion theory behind defendant's killing of Lua was not supported by substantial evidence.

"Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Beltran, supra,* 56 Cal.4th at p. 957.) "The provocation may be anything that arouses great fear, anger, or jealousy." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 233, p. 1056.) However, cases finding provocation typically involve adultery, a violent assault or other extreme acts by the victim; a simple assault or rude behavior rarely suffices. (*Id*. §§ 234-235, pp. 1057-1059.) This flows from the *objective* component of the test, that is, that the acts of the victim must be serious enough to obscure the reason or inflame the passions of

9

a *reasonable* person. Thus, although verbal abuse may be sufficient, such abuse must be so extreme as to be likely to inflame a reasonable person. (*Id.* §§ 236-237, pp. 1059-1062; see *People v. Lee* (1999) 20 Cal.4th 47, 59-60 [an argument is not enough].)

Words alone will rarely cause a *reasonable* person to become inflamed and lose his self-control. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching"]; *Manriquez, supra,* 37 Cal.4th at p. 586 [calling Manriquez a "mother fucker" and taunting him insufficient]; *People v. Najera* (2006) 138 Cal.App.4th 212, 216, 226 [calling Najera a "faggot" and continuing a heated argument was insufficient]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739-740 [Lucas shot into car; even if occupants were smirking, giving him dirty looks and calling him names, insufficient]; cf. *People v. Le* (2007) 158 Cal.App.4th 516, 518-523, 525-526 [prolonged humiliation caused by Le's wife's infidelity with a gang member who Le thought would kill him, and who taunted Le, sufficed; it was error to instruct that words alone were insufficient].)

By this standard, what defendant claimed Lua said falls short of those kinds of words that would inflame a reasonable person to act rashly and without judgment.

Moreover, any error was harmless.

We apply the *Watson* standard of prejudice (see *People v. Watson* (1956) 46 Cal.2d 818, 836) to any error. (See *Beltran, supra,* 56 Cal.4th at p. 955; *People v. Thomas* (2012) 53 Cal. 4th 771, 814; *People v. Breverman* (1998) 19 Cal.4th 142, 177-178.)[3] Under that standard, it is not reasonably probable instructing the jury on heat of passion manslaughter would have made any difference to the outcome in this case.

_____

[3] A decision filed last year by a panel of the First Appellate District concludes such an error is one of federal constitutional dimension, subject to the heightened *Chapman* standard of review (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]) for

10

As set forth *ante* at footnote 1, CALCRIM No. 570 defines the provocation needed to reduce a murder to manslaughter, informing the jury it must cause "a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment[,]" and can occur over a short period of time; it also informs that defendant "is not allowed to set up his own standard of conduct" but the jury must "consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570.)

Further, the instruction requires that the People bear the burden of proof beyond a reasonable doubt that defendant did not act out of heat of passion. (CALCRIM No. 570.)

In this case, the jury was already instructed that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (CALCRIM No. 522.) The jury was also instructed the People had the burden to prove first degree murder over any lesser crime beyond a reasonable doubt. (CALCRIM No. 521.) In the face of such instructions, given the first degree murder finding, it is clear the jury rejected defendant's version of events. His claims about Lua's statements were uncorroborated, and by his own testimony they did not make him angry; therefore, it is not reasonably probable a heat of passion instruction further defining provocation would have made any difference to the verdict in this case.

harmless error. (*People v. Thomas* (2013) 218 Cal.App.4th 630 [review den.].) Until our Supreme Court instructs otherwise, we will apply the *Watson* standard in such cases, as defendant herein agrees we must. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

11

Accordingly, we reject defendant's contentions regarding provocation.

## III

### *Consciousness of Guilt*

Over defense objection, the trial court gave a tailored version of pattern instruction CALCRIM No. 371, as follows:

> "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. [¶] If you conclude the defendant made such an attempt, it is up to you to decide its meaning and importance; however, evidence of such an attempt cannot prove guilt by itself."

This instruction defines a permissive, not compelled, inference the jury *may* draw if it finds the defendant did in fact try to hide evidence.

Defendant objected to the instruction, but the trial court found his evasive testimony about what he did with the gun was sufficient to justify the instruction. We agree. Defendant testified in detail about the fear which led him to buy the gun, and about where he stored it when he was not carrying it. That gun was important to him. That he claimed not to remember what he did with it after he shot Lua gave rise to a rational inference that he concealed it for the purpose of hiding his guilt. The instruction left the jury free to draw an innocent inference, that is, that in his panic, defendant simply forgot what he did with the gun. (See *People v. Avila* (2009) 46 Cal.4th 680, 709 [instruction does not compel the jury to draw any inference nor does it "impermissibly lessen the prosecutor's burden of proof even when erroneously given"].) But the jury was not compelled to accept defendant's testimony that he did not remember what he did with the gun, but could rationally find he concealed it to avoid detection or prosecution. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1225.)

12

IV

*Cruel and Unusual Punishment*

Defendant contends his 50-year sentence violates the Eighth Amendment because he was a minor when he murdered Lua with a firearm. We disagree.

Under a series of recent decisions, the United States Supreme Court has construed the Eighth Amendment to preclude a person from being sentenced to death for any crime committed as a juvenile (*Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1]), preclude such a person from being sentenced to life without parole (LWOP) for a non-homicide (*Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825]), and preclude such a person from being sentenced to LWOP for a homicide unless the sentencing body has an opportunity to consider mitigating circumstances calling for a lesser sentence (*Miller v. Alabama* (2012) 567 U.S. __ [183 L.Ed.2d 407]). Defendant contends his sentence violates the principles underlying *Miller*.

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held that a sentence to a term of years that exceeds the normal life expectancy of a person who committed a non-homicide offense was equivalent to an LWOP sentence and therefore invalid under *Graham*. (*Caballero*, *supra*, 55 Cal.4th at p. 268.) The court defined "life expectancy" to mean "the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Id*. at p. 267, fn. 3.)[4]

On appeal, defendant concedes that his sentence does not exceed his natural life expectancy, and estimates he will be eligible for parole when he is about 68 and a half

_____

[4] The impact of *Miller* to LWOP sentences imposed on persons who were juveniles at the time of their offenses was recently addressed by our Supreme Court in *People v. Gutierrez* (May 5, 2014, S206365) __ Cal.4th ___ [2014 Cal. Lexis 3135].) Defendant argues his failure to object on Eighth Amendment grounds is excused because *Miller* had not been decided at the time of sentencing. The People do not argue forfeiture. Accordingly, we address the merits of the claim.

years old.  (See *People v. Mendez* (2010) 188 Cal.App.4th 47, 62-63 [average life expectancy for 18-year-old male is 76 years].)  This dooms defendant's contention of error, because it shows that his sentence does not equate to LWOP, and does not violate *Miller* or its underlying principles.  *Caballero* was clear that "life expectancy" did not refer to an average *prison inmate's* life expectancy, but normal life expectancy. (*Caballero*, *supra*, 55 Cal.4th at p. 267, fn. 3.)

Defendant cites *People v. Perez* (2013) 214 Cal.App.4th 49 for the proposition that he must have an opportunity for a "meaningful" or "substantial" life expectancy outside prison, and that "the seven and a half years he would have remaining in his life after having spent 50 years in prison can hardly be characterized as 'meaningful.' "  We will not assume defendant will have no opportunity to do something useful with his life, even if he is old and infirm.  Many have led meaningful lives during periods of advanced age and infirmity.  The probation report shows that defendant is married with two children.  He can participate in the lives of his children--and perhaps grandchildren--to some extent from prison, and can do so more fully if he is ever paroled, even later in life. (See, inter alia, *In re T.S.* (2003) 113 Cal.App.4th 1323, 1328.)  That participation alone provides a worthy, redemptive, and "meaningful" purpose in life.

As defendant concedes, the Legislature has determined that persons such as defendant, who use firearms to premeditatedly murder another person, should serve 50 years in prison.  (§§ 190, subd. (a), 12022.53, subds. (a)(1), (d) & (h).)  Application of that legislative norm in this case does not "shock the conscience" simply because defendant was a week shy of 18 when he murdered Lua.  (Cf. *In re Lynch* (1972) 8 Cal.3d 410, 424 [applying California Constitution].)  Nor has defendant shown that the

14

Eighth Amendment was violated. Accordingly, we reject defendant's cruel punishment claims.[5]

V

*Abstract Correction*

Defendant contends, and the People concede, that there is an error on the abstract of judgment requiring correction. The trial court imposed a $30 criminal conviction assessment fee, which by law was applicable to each of the three counts (see Gov. Code, § 70373), amounting to $90, but the abstract incorrectly reflects $120. We agree that the abstract should be corrected. We also note that the determinate portion of the abstract fails to include the number of years for the five-year term imposed and stayed on count 2. The number "5" should be added to the "yrs" column for that count.

_____

[5] After the briefing in this matter was completed, the Legislature adopted a procedure for persons like defendant herein, providing that those persons who received lengthy terms for crimes committed while juveniles will receive a "youth offender parole hearing" after 25 years. (§ 3051, subd. (b)(3), Stats. 2013, ch. 312, § 4 [Sen. Bill No. 260].) The impact of this new procedure in light of *Miller* is now pending in two cases before our Supreme Court. (See *In re Alatriste*, S214652 and *In re Bonilla*, S214960.) Included in those cases is the issue whether a 50-year-to-life sentence "for murder committed by a 16-year-old offender [is] the functional equivalent of life without possibility of parole by denying the offender a meaningful opportunity for release on parole?" (*Id*., Case Summary Statement of Issues.) Here, defendant--nearly 18 at the time he murdered Lua--concedes his sentence does not exceed his natural life expectancy. In light of defendant's concession and our conclusion that his sentence is not the functional equilivalent of LWOP, we need not address the impact of section 3051, subd. (b)(3) in this case.

15

## DISPOSITION

The judgment is affirmed.  The trial court shall prepare and forward to the Department of Corrections and Rehabilitation a corrected abstract of judgment.

           _____DUARTE_____, Acting P. J.

We concur:

_____MURRAY_____, J.

_____HOCH_____, J.

16