[No. A045533. First Dist., Div. Two. Sept. 26, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS ANTHONY CRAWFORD, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certifed for publication except for parts A and C of the Discussion.

COUNSEL

John K. Van de Kamp, Attorney General, and Christopher W. Grove, Deputy Attorney General, for Plaintiff and Respondent.

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Kent Barkhurst, Deputy State Public Defender, for Defendant and Appellant.

OPINION

KLINE, P. J.—Appellant Louis Anthony Crawford appeals following his conviction by jury of first degree murder (Pen. Code, § 187). He contends his conviction must be reversed because the court improperly (1) permitted the use of statements appellant made to a probation officer; and (2) instructed the jury on felony murder, which was not charged in the information. He also maintains the case must be remanded for resentencing because the court failed to consider the reasons underlying appellant's sentence on another offense that was ordered to run concurrently with the instant sentence. We shall affirm the judgment and remand for resentencing.

STATEMENT OF THE CASE

On October 14, 1988, an information was filed in Contra Costa Superior Court, charging appellant with a violation of Penal Code section 187 (mur-

der). The information additionally alleged that appellant personally used a dangerous and deadly weapon (a knife) in the commission of the offense, within the meaning of Penal Code section 12022, subdivision (b).

Trial began on February 21, 1989, and lasted six days. On March 1, 1989, the jury found appellant guilty of first degree murder and found the deadly weapon enhancement allegation to be true.

At sentencing on March 31, 1989, the court sentenced appellant to a term of 25 years to life for the murder. The court also imposed the one-year enhancement, making the total term imposed twenty-six years to life. The court then ordered that the term was to run consecutively to a sentence earlier imposed by the Solano County Superior Court for crimes against the mother of the victim in the present case, except that the one-year enhancement was ordered to run concurrently.

Appellant filed a timely notice of appeal on March 31, 1989.

STATEMENT OF FACTS

Appellant admitted killing 30-year-old Stephanie Dudla. The only issue at trial was whether appellant had acted in self-defense or was guilty of some less serious form of homicide than first degree murder.

The victim's mother, Alice Dudla, testified that on December 24, 1986, she was living in Vallejo with her daughter Stephanie. Stephanie returned home from work at approximately 9:15 that night. Mrs. Dudla's other children, Debra and Stephen, were expected with their families that evening to open Christmas presents.

At 10 or 10:30 that evening appellant arrived at the house and asked to speak with Stephanie. Stephanie stepped outside briefly to speak with appellant then returned to open presents. Appellant knocked again after 15 to 20 minutes; eventually Stephanie left with appellant. Because Stephanie left her purse behind Mrs. Dudla expected her to return in a few minutes. Stephanie had not returned by the time the others left, and Mrs. Dudla decided to wait up for her.

At approximately 1:45 a.m. Mrs. Dudla heard Stephanie's car drive up to the house and heard a key open the door to her house. When she turned, she saw appellant, not Stephanie, had entered her house. Appellant's hand was wrapped in a bloody rag and he had wounds on his thumb and finger. Appellant immediately went to the kitchen and returned with a butcher knife. He ordered Mrs. Dudla to remove all her clothes. Appellant assaulted

Mrs. Dudla with the knife, stabbing her face and her throat and cutting her esophagus.[1] He also hit her with a power drill, which caused her briefly to lose consciousness. Mrs. Dudla finally was able to lock herself in the bathroom; she then noticed smoke coming under the door and realized appellant had set fire to her house. At that point she managed to climb out the bathroom window and run to a neighbor's house. Mrs. Dudla spent approximately 10 days in the hospital recovering from her wounds and a collapsed lung.

At trial Mrs. Dudla testified that appellant did not appear intoxicated or disoriented during the attack and was able to give her orders without difficulty.

Stephanie's body was found in Richmond on Christmas Day. Steve Zeppa, an officer with the Richmond Police Department, testified that the victim was found lying on her back; her underpants were torn and pulled up above her waist and her bra and sweater were pushed up above her breasts.

Dr. Louis Daughtery, who conducted an autopsy on the body, testified there were numerous areas of recent trauma on the body. The doctor found swelling and abrasions on the head, and additional abrasions on the neck and jaw. Stephanie's forehead and nose were bruised and there were blunt lacerations on both her upper and lower lips, some of which went completely through the lips. One of the front teeth was chipped and loose, probably as a result of significant blunt force. After viewing photographs of appellant's injured hand the doctor testified that appellant's wounds were consistent with the wounds that might be expected if appellant had used his fist to cause the victim's injuries.

Dr. Daughtery further testified that Stephanie suffered a stab wound to the right chest. The autopsy revealed that the knife entered the right ventricle and left a five-inch deep wound. This type of wound would cause death in, at most, a matter of minutes. According to the doctor, the wound likely would cause significant bleeding primarily inside the body, depending on the position of the body.

Dr. Daughtery explained that when someone is trying to ward off a knife attack there often will be irregular, torn cuts on the victim's arms and hands caused by the fact that the hands and knife are moving when they come in contact. No such defensive wounds were found on Stephanie's body. There was no evidence of trauma to the anus or vagina. Finally, there were abrasions and lacerations on both legs.

---

[1] The prosecution was not permitted to present evidence concerning the sexual nature of the assault on Mrs. Dudla.

Linda Robinson testified that at the time of trial she had known appellant for approximately 14 years. Robinson testified that she often saw appellant with Stephanie, whom he referred to as his girlfriend. On the night of December 24, 1986, appellant came to her home looking for Robinson's boyfriend. Appellant told her he had "killed Stephanie in a strange way."[2] Robinson's boyfriend then arrived and they told appellant to leave.

Stephen Dossman testified that on December 27, 1986, he was arrested for driving a stolen car appellant had loaned to him.[3] He told the police he was supposed to return the car to appellant at a designated time and place. The police accompanied Dossman to the appointed meeting place and arrested appellant.

Susan Swarner, a criminalist with the Contra Costa County Criminalists' Laboratory, testified regarding the blood found in the victim's car. Ms. Swarner stated that she found blood smears or drops on the passenger side window, on the passenger door handle, the right fender and the outside of the driver's door. The inside of the car was heavily stained with blood—on the seats, radio, steering wheel and the inside of the windshield.

A pair of purple sweatpants, heavily stained with blood, was found in the rear of the car. According to Ms. Swarner, these pants matched the sweatshirt taken from the body of the victim. The front of the sweatshirt was stained with blood that apparently had soaked in from the exterior of the shirt. The sweatshirt was torn at the shoulder seam, but had no knife cuts in it. Blood was also found on the corduroy pants appellant was wearing.

Ms. Swarner testified that most of the blood found could have come from appellant, but not from the victim or her mother. The only stain in the car that could only have come from Stephanie was found on the driver's side headrest[4] In addition, certain stains on the right side of appellant's shirt were consistent with Stephanie's blood and inconsistent with appellant's.

*The Defense*

Appellant testified that he had known Stephanie since she was 14 or 15 years old. Eventually appellant and Stephanie developed a relationship

---

[2] After her recollection was refreshed on cross-examination Robinson recalled that she told an investigator that appellant had stated "he might have did something to Stephanie," but did not specify what he did. On redirect Robinson explained that appellant told her both that he "did something" to Stephanie, and that he killed her.

[3] The stolen car was Mrs. Dudla's Honda Civic.

[4] The blood on the front of Stephanie's sweatshirt was not tested because the criminalist thought it obviously came from Stephanie's extensive facial wounds.

based on their mutual interest in drugs. According to appellant, he spent the night at Stephanie's house "quite a few times" without her mother's knowledge.

Appellant testified he went to Stephanie's house after 9 p.m. on December 24, 1986. He and Stephanie went to see some friends and then to purchase drugs. Appellant purchased four rocks of cocaine with Stephanie's money; he and Stephanie sat in her car and smoked the cocaine. They then engaged in sexual intercourse in the backseat of the car.

When they returned to the front seats they began arguing over the division of the cocaine. Appellant testified that Stephanie slapped him in the face first; they then became involved in a violent fight and appellant admitted striking her hard. Appellant further explained that his hand was cut when he tried to grab the knife from Stephanie. When appellant finally was able to take the knife from her he "poked" the knife at Stephanie, intending to stab her, but not kill her. After that, it seemed to appellant that everything "just stopped" and "got silent." Appellant went to the passenger's side of the car, took the body out and placed it near the BART tracks, where it was later discovered. He later threw the knife out of the car as he was driving.

On cross-examination the prosecutor was permitted, over defense counsel's objection, to question appellant regarding statements he made to a probation officer. Appellant asserted he thought it was important to "make [his recollection of the incident] sound good" to the probation officer even if he had to lie to her. He testified that he "didn't care if she wanted to hear the truth or not."

Appellant stated at trial that the drugs he consumed on the night of the homicide did not affect his perceptions or thought processes. He testified that he did not recall seeing Stephanie's severe facial injuries and did not remember her bleeding from those wounds. According to appellant, Stephanie had a knife in her hand and was still fighting him after he inflicted the facial injuries. He further maintained that Stephanie was in the passenger seat during the fight and was unable to explain why her blood was found on the driver's headrest. Finally, he claimed he did not drag Stephanie's body and could not explain why mud was found on the back of her heels.

*Rebuttal Testimony*

Carina Ramsey, the probation officer who interviewed appellant in connection with the offenses committed against Mrs. Dudla, testified as a rebuttal witness for the prosecution. She stated that appellant claimed he did not

know how Stephanie's body ended up in Richmond; that he had not been to Stephanie's home on the night of December 24; and that he had not returned to Stephanie's home after her death. During cross-examination Ms. Ramsey admitted she had not *Mirandized* appellant, but had told him "he [didn't] have to discuss things with [her]."

DISCUSSION

A. *Use of Statements Made to Probation Officer**

. . . . . . . . . . . . . . . . . . . . . .

B. *Felony-murder Instruction*

 Appellant contends that because he was charged only under Penal Code section 187 (first degree murder) the court erred in instructing the jury on the theory of felony murder. (Pen. Code, § 189.) Appellant maintains the improper instruction deprived him of his Sixth Amendment rights by denying him notice of the charges against him.

In support of this contention appellant relies primarily on *Sheppard* v. *Rees* (9th Cir. 1990) 909 F.2d 1234. In *Sheppard*, the defendant was charged with one count of murder under Penal Code section 187 and was tried on the theory the murder was premeditated and deliberate. The prosecutor did not raise the possibility of pursuing a felony-murder theory either before or during trial. The day after both attorneys had submitted and argued their jury instructions the prosecutor for the first time requested a felony-murder instruction, which was given over the strenuous objection of Sheppard's counsel. The jury convicted Sheppard of first degree murder without specifying what legal theory supported the verdict.

On appeal, the Attorney General argued its murder pleading practice afforded the defendant adequate notice, but *conceded* the prosecutor's conduct "affirmatively misled the defendant, denying him an effective opportunity to prepare a defense." (909 F.2d at p. 1236, original italics omitted.)

The court went on to hold the error was so fundamental that it could not be subjected to the harmless error standard set forth in *Chapman* v. *California,* [(1967)] 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Because the felony-murder theory was not introduced until after all the evidence was received and the instructions settled the new instruction "per-

---

* See footnote *ante,* page 1.

mitt[ed] the jury to convict on a theory that was neither subject[ed] to adversarial testing, nor defined in advance of the proceeding." (909 F.2d at p. 1237.) The court concluded that because this error "goes to the heart of our adversarial process" it *necessarily* denies a defendant the fundamental right to a fair trial.

*Sheppard* is not dispositive of this issue. ■■■ First, while *Sheppard* is persuasive authority for appellant's position, it is not binding on this court. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129] [lower federal court decisions are not binding, but are "persuasive"].) Legally, we are bound by our Supreme Court's decision in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], which, though it does not explicitly reject the principle enunciated in *Sheppard*, is nonetheless difficult to square with the opinion in that case. In *Murtishaw* the defendant claimed he did not receive adequate notice the prosecution would rely on a felony-murder theory. The court rejected this claim and stated, "it has long been settled that under an accusatory pleading charging murder in the short form prescribed by Penal Code sections 951 and 952 the accused may be convicted of first degree murder on the theory that the murder was committed in the perpetration of a felony. (*In re Walker* (1974) 10 Cal.3d 764, 781 . . . .) Thus a defendant, charged with murder, is on notice that the prosecution may seek to prove that charge by showing that the homicide occurred during the commission of an enumerated felony." (29 Cal.3d 733, at p. 751, fn. 11; see also *People* v. *Thomas* (1987) 43 Cal.3d 818 [239 Cal.Rptr. 307, 740 P.2d 419] [rejecting defendant's claim he was improperly convicted of involuntary manslaughter when the information charged him exclusively with voluntary manslaughter].)

*Sheppard* is also distinguishable on its facts. While the opinion in *Sheppard* does not provide much of a factual account, it is apparent the robbery (the felony underlying the felony-murder theory) did not figure prominently in the trial. In addition, the prosecutor waited until the last moment—after the instructions had been settled—to raise the possibility of proceeding on a felony-murder theory. Under these circumstances the Attorney General felt compelled to admit defendant had been misled and his Sixth Amendment rights violated. Thus, while *Murtishaw* approved the use of a felony-murder theory even where the defendant has been charged with murder in the short form, that decision could not overcome the prosecutor's affirmative misconduct in *Sheppard*.

In comparison, the record in this case proves appellant could not have been misled by the district attorney. The record shows that *before trial began* both attorneys discussed with the court the theory that appellant

raped or attempted to rape Stephanie before her murder. The prosecutor stated, "It's the People's contention . . . that [appellant] stabbed two women, sexually assaulted one in Vallejo and *appears to have sexually assaulted the woman he murdered down in Richmond.*" (Italics added.) The court observed, "Well, I think the jury is fairly likely to infer that when she's partially disrobed . . . there was either a rape or attempted rape." The following discussion ensued:

"THE COURT: What you're really trying to say is because he raped the victim in Vallejo, that that proves that he raped the victim in Richmond.

"MR. BURKE [the district attorney]: Yes.

"MR. BANCROFT [defense counsel]: And that he killed her after he raped her.

"MR. BURKE: That's right."

While these comments do not necessarily show an intent to pursue a felony-murder theory they certainly informed the defense that the prosecutor believed appellant had raped or attempted to rape Stephanie. Quite clearly, the prosecutor was not being deceptive and misleading, as was the prosecutor in *Sheppard.*

Furthermore, toward the end of its pretrial discussion with counsel the court observed that the evidence concerning the assault on Mrs. Dudla was "not unduly prejudicial *if it goes to establish a felony murder.* I mean it establishes one of the elements that the People have to establish, murder by premeditation or *under the felony murder rule.*" (Italics added.) These statements further bolster our conclusion that appellant could not have been surprised by the court's instructions on felony murder.[8] After reviewing this record we are satisfied appellant's rights were not compromised.[9]

---

[8] Appellant cites *Gray* v. *Raines* (9th Cir. 1981) 662 F.2d 569 in support of his contention that he did not receive adequate notice of the prosecution's felony-murder theory. There, the defendant, who was charged with forcible rape, testified he had engaged in consensual sexual relations with the complaining witness. Near the close of evidence the prosecution sought an instruction on statutory rape and Gray was convicted of that offense. On appeal, he successfully argued the belated change in the prosecution's theory denied him adequate notice of the charges against him.

*Gray* is clearly distinguishable. In that case defendant's testimony that he had engaged in consensual sex with the victim virtually guaranteed his conviction of statutory rape, to which consent is no defense. Thus, in *Gray,* unlike the instant case, the defendant was obviously prejudiced by the prosecution's change in theory.

[9] At oral argument appellant's counsel asserted appellant would not have testified—and thus admitted he engaged in sexual relations with Stephanie prior to the murder—if he knew the prosecution was going to pursue a felony-murder theory based on an alleged rape. This

## C. *Sentencing**

. . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed and the matter is remanded for resentencing in accordance with this opinion.

Benson, J., and Peterson, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 20, 1990.

---

argument is unconvincing. The prosecution presented strong evidence that appellant brutally murdered Stephanie and unceremoniously disposed of her body. Appellant's sole defense, that he killed Stephanie in self-defense in the course of a struggle, could be presented only through appellant's testimony. We think it exceedingly unlikely that any competent counsel would have advised appellant to forgo his one possible defense to a charge of first degree murder simply to avoid the possibility of admitting he had had sex with Stephanie, especially where that admission would be largely cumulative to other physical evidence suggesting Stephanie had engaged in sexual relations prior to her death. We thus do not believe appellant's decision whether to testify would have been any different had he earlier known that the prosecution would proceed on a felony-murder theory.

* See footnote *ante,* page 1.