Filed 5/22/23  In re I.W. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> I.W., <br><br>     Defendant and Appellant. | A161394 <br><br> (Solano County <br> Super. Ct. No. J44227) |

The juvenile court determined that minor I.W. committed robbery based on an incident in which two chains were grabbed from the victim's neck at a party.

Minor contends reversal is required because the prosecution argued for the first time in rebuttal that minor was guilty of robbery as an aider and abettor even if he did not grab the chains himself.  Minor further contends the court's determination was not supported by substantial evidence.  He also argues the juvenile court abused its discretion in declaring a wobbler offense in a Sacramento County juvenile court case to be a felony.

We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

*House Party on July 20, 2018*

In July 2018, Richard A. allowed his two high school-aged sons to have a party in the backyard and garage of their house. Richard's friend Mario Yokoi and a few other adults were home the evening of the party.

The backyard was fenced and abutted an alley; partygoers entered the backyard through a gate on the alley and could reach the garage from the backyard. By 10:00 p.m., about 25 to 30 teenagers were at the party, and Richard knew all of them.

Later, Richard was inside the house when his wife told him there was a fight in the backyard. Richard went outside and broke up the fight. He escorted one of the fight participants and his friends out to the alley and told them they had to leave. At this point (around 11:53 p.m.[1]), the party became "very chaotic," and Richard observed two more physical attacks in the backyard.[2]

Around this time, party guest J.M., who was 17 years old, felt chains he was wearing around his neck break and heard the person who grabbed his chains say, "got yo chains." Another party guest, Alden Alvarez, noticed a confrontation between J.M. (whom he knew) and another person; J.M. was crying and asking for his chain back, and the other person was yelling and threatening J.M. Alvarez approached the person who was yelling at J.M. and said he should give back the chain. Alvarez was then attacked by a group of

---

[1] Based on a neighbor's surveillance videorecording of the alley and back of the house, it appeared Richard walked out to the alley with the kids he told to leave at about 11:53 p.m.

[2] First, Richard saw three or four people he did not recognize kicking someone. Then, as he walked one of the aggressors out toward the alley, Richard saw "another person was being jumped" to his right.

2

people he did not know; they hit and pushed him and eventually pushed him through a window.

According to Richard, "[e]verything was going crazy." Richard punched "a really huge dude" wearing a white t-shirt, and they went to the ground. Richard heard a gunshot and realized his leg was bleeding. Yokoi ran up to the "big guy" in the white t-shirt and hit him with a golf club. Richard described the scene as "total chaos at that point" with people "running everywhere, jumping fences." Yokoi told everyone to leave; the "big guy" in the white t-shirt and others left through the gate to the alley. Richard and Yokoi followed the departing partygoers into the alley and to the street at the end of the block. There, Richard saw a group of men and a gun pointed at him. Richard kept saying, "we don't want no trouble." Richard and Yokoi were shot multiple times, and Yokoi died on the street. Richard suffered four gunshot wounds that night and survived.

*Wardship Petition*

In August 2018, the Solano County District Attorney filed an initial Welfare and Institutions Code section 602 petition against minor. The operative second amended petition alleged minor attempted to murder Richard A. (Pen. Code,[3] §§ 664, 187, subd. (a); count 1), committed second degree robbery of J.M. (§ 211; count 2), and murdered Yokoi (§ 187, subd. (a); count 3).

*Jurisdictional Hearing*

The jurisdictional hearing began August 25, 2020, and concluded October 16, 2020. The parties presented 23 live witnesses and stipulated to the testimony of seven additional witnesses.

---

[3] Further undesignated statutory references are to the Penal Code.

3

Prosecution

M.M., who was 15 years old at the time of the party, testified under a grant of use immunity. He considers Richard an uncle, although they are not related.[4] M.M. was very close with Richard's teenaged sons and would go to their house every weekend.

M.M. knew minor and invited him to the party.[5] He sent minor a direct message on Instagram with a flyer for the party and the address of Richard's house.[6] M.M. messaged, "pull up to my party, it's a smoke out," and asked minor who he would be coming with. Minor responded, "I'm going to pull up like two cars deep." M.M. messaged, "I'm going to tell them you're with me." Minor responded, "don't tell them because I'm trying to strip shit." M.M. testified this meant minor "was maybe going to steal some stuff." M.M. told minor to bring some dope. Minor responded, "We gonna leave with all their dope," and sent M.M. a photo of minor and what appeared to be a handgun with a high-capacity magazine. Then minor asked, "But nah is it good to strip them?" and, "You sure they randoms[?]" M.M. responded, "Most of them. Just don't strip none of my family." M.M. suggested that minor break into the cars of party guests.[7]

---

[4] Richard also referred to M.M. as his nephew and explained that he and M.M.'s father had been best friends since childhood.

[5] Evidence was presented that many of the party guests knew Richard's sons and each other from high school or the neighborhood. M.M. and minor, however, were from different towns.

[6] Richard testified that M.M. had posted a flyer for the party on Instagram. The flyer said to text M.M. for the address of the party.

[7] M.M. messaged, "Strip me down the street," "Just bip they whips," and, "They going to have something in their cars." M.M. testified a "whip" is a car, and "bip" means "[b]reak a window."

4

M.M. testified that minor came to the party and that he (M.M.) introduced minor to Richard's sons. According to M.M., he "made [minor] shake hands with [Richard's sons] before [minor] invited his own friends into my party." M.M. testified that minor asked Richard's sons and M.M., " 'is it cool if I got my people that come in here[?]' " M.M. saw minor's friends come in the backyard to the party.

M.M. heard yelling in the backyard; he saw some kids fighting, and an adult broke up the fight. Then "just more fights broke out." He heard someone say, "can I get my chain back," and Richard came and separated everyone. M.M. testified that he could not remember or explain everything, but there were "[p]eople fighting everybody everywhere."

According to M.M., minor was "fighting somebody and somebody went through a window." M.M. saw minor "tussling and wrapped up with somebody, and then everybody was just moving around trying to fight." M.M. heard gunshots and ran. He broke down a fence and went to the front of the house.

When Richard was on the ground after he and Yokoi had been shot, M.M. went to him and said, "I think I know who did this," referring to minor and the people he brought to the party. M.M. testified that he suspected minor and his friends because "those were the people who were the first people gone and who started another fight" at the party. M.M. elaborated that, after the shooting and when the police arrived, many of the people from the party were still in the area, but minor and his friends had left the scene. M.M. showed a police officer a photo of minor from Instagram with minor's Instagram username.

Twelve days after the party, a police officer interviewed Alvarez, who believed he could identify two people at the party: the person he observed

5

yelling at J.M. and a "big dude" who "got in [Alvarez's] face" and pushed him into the window. Alvarez was shown a series of three six-pack photo lineups. Within three or four seconds of viewing the first lineup, he picked minor's photo, and he did not identify anyone in the next two. Of minor's photo, Alvarez told the officer, "yeah that's the kid," referring to the person he saw yelling at J.M. ("[t]he person in [J.M.]'s face").[8]

As part of the investigation, police searched minor's home and his social media accounts. In minor's home, officers located a paper mache-like mask that read "Strip Team" across the forehead and what an officer described as "a business card-sized piece of paper with hashtag strip team on it."

Minor's Instagram account showed the instant message exchange M.M. described in which he and minor discussed minor's plan to "strip shit" at the party (including a photo of minor with a firearm, high-capacity magazine, and another magazine with a bullet casing on top of it). On the day of the party, minor also sent Instagram messages providing Richard's home address to nine recipients. In addition, police found a video on his Instagram account

---

[8] Months later (on December 14, 2018), however, Alvarez was shown another photo lineup and chose a photo that was not of minor. At the jurisdictional hearing in September 2020, Alvarez testified he could not identify the person who had been yelling at J.M. and whom he told to return the chain "because it's been so long," although Alvarez was sure he could have identified the person right after the event. He testified that he "couldn't directly say yes or no," but minor "looks similar" to the person he saw yelling at J.M.

in which minor appeared to be rapping.[9]  The video was taken two days after the party and showed minor wearing a crucifix pendant on a chain.[10]

J.M. testified that two chains were taken from him at the party: one with a crucifix and another with an angel pendant.  The crucifix that minor was wearing in the video recorded two days after the party appeared to be J.M.'s crucifix.  J.M. thought the chain minor was wearing in the video looked thinner than his, but "[t]he crucifix looks honestly like mine.  Like it had that little round thing too at the top."

J.M. testified that he knew most of the people at the party, but when the party was dying down, a group of four to six people he did not recognize arrived dressed in dark clothes.  J.M. did not recognize the person who took his chains.  The person was wearing a denim jacket with a loose hood of a different color and fabric.  J.M. did not see the person's face in the light; "It was all just like shadows."  J.M. described the person as skinny and "mixed" or part African-American.  J.M. testified the person was not much taller than he was (five feet, seven inches), but he previously told the police the person who took his chains was about five feet, 11 inches tall.[11]

Richard's son J., who was 15 years old at the time of the party, was called as a witness by minor.  He testified that he knew most of the people at the party, but he did not know minor.  J. saw minor enter the party through the back gate and saw other people walk in with him.  J. testified that he did

---

[9] M.M. testified that minor was trying to be a rapper.

[10] Minor was wearing two chains and the other chain read "Samantha." In an August 2018 search of minor's home, the Samantha necklace was found, but there is no mention of a crucifix pendant.

[11] Minor is African American, and around the time he was arrested, he was six feet, one inch tall and weighed 137 pounds.

not see a chain get taken but he heard Alvarez tell minor "to give the chain back." Within a few days after the party, J. picked minor's photo out of a photo lineup and told the police, "he's the leader, he came in first."

Defense

M.M. testified on cross-examination that "like 200 out of the people that I invited" to the party showed up.[12] M.M. testified that he told Richard's son J. he had invited someone who talked about stealing at the party, and that J. wanted to break into cars himself because he was broke.[13]

During the investigation, victim J.M. was shown a photo lineup and chose a photo that was not of minor. When Alvarez was shown a photo lineup in December 2018, he chose a photo that was not of minor. Alvarez testified he saw the person yelling at J.M. "but not super clearly because it was very dark during the fight."

Sergeant Michael Tegeler reviewed surveillance video recorded in the alley the night of the party and observed that minor appeared in the alley walking to the party at 11:45:43 p.m. with only two people walking behind him. At 11:55:02, a sudden burst of young people began leaving Richard's

---

[12] Richard, on the other hand, estimated there were about 60 people in the backyard when the party became chaotic. One teenaged party guest told the police there were probably about 55 people at the party at most. Another witness thought there were about 50 to 60 people at the party when he arrived at around 10:00 p.m. When the police arrived after the shooting, an officer estimated there were around 50 to 60 people in the area. (This number would have included some adults and other family members who had been inside the house during the party.)

[13] J., however, denied he had a conversation with M.M. about breaking into cars at the party. J. also denied that M.M. introduced minor to him and his brother at the party and denied that M.M. asked if it was okay for minor to come to the party.

8

backyard through the gate to the alley, and at 11:55:51, minor could be seen leaving the backyard.

Dr. Steven Frenda testified as a defense expert in eyewitness memory. He explained that memory is "vulnerable to suggestion" and stress or intoxication[14] can impair memory regarding details.

Frenda testified that the "cross-race identification problem" or "own race bias" refers to the phenomenon that "people are better or more accurate at identifying strangers who are the same race or ethnicity as themselves and tend to not be as accurate when it comes to making identifications of strangers who are of a different race." "[P]hoto bias identifications" refers to the problem that when "a witness is exposed to a photograph of a suspect before they make an identification later on, they become more likely to select that person from a subsequent lineup, whether or not that person is in fact the perpetrator."[15] "[U]nconscious transference" happens when, for example, a witness sees a bystander at the scene of the crime and mistakenly associates the bystander with the crime.

---

[14] On cross-examination, J.M. agreed he told the police he was so drunk that he could not remember clearly, but at the jurisdictional hearing he testified he was in shock, not drunk, and he only drank alcohol before the party, not at the party. He was using marijuana at the party. Alvarez testified he may have had a small shot of alcohol and he smoked marijuana before he went to the party.

[15] Defense counsel elicited testimony from Alvarez that he saw minor's photo on Instagram. He also testified that in the week after the party, he was often with Richard's sons and others who had been at the party "talking about how this could have happened" and "trying to figure out everything," including who did it and why. Alvarez maintained, however, that he was shown minor's photo only after he talked to the police on August 1, 2018, when he picked minor's photo in a lineup.

Frenda reviewed the six-photo lineup used in the investigation that included minor's photo. He "had some concerns" about the lineup because it did not appear that the filler photos (the five photos of "known innocents") matched the witness descriptions of the suspect ("small, skinny and light-skinned"). Frenda found it potentially suggestive that minor's photograph was different from the others in that his face was turned slightly to the side and his head was larger in the frame. Also, minor's hairstyle was different from the hairstyles in the filler photos.

Court Decision

The juvenile court found the robbery charge (count 2) true beyond a reasonable doubt. It found "extensive and more than substantial evidence supporting that charge." As to the attempted murder and murder charges (counts 1 and 3), however, the court determined the prosecution did not prove its case beyond a reasonable doubt.[16]

---

[16] As described by the juvenile court, the evidence that minor was the person who shot Yokoi and Richard in the street was the identification testimony of Richard and one other eyewitness. While the court found Richard to be truthful in his testimony, the court noted the following problems with his identification. Richard viewed the shooter "in the dark with a large amount of chaos going on, it happened quickly. There was a number of youth that may look similar to the defendant present. There was gun focus and not a very good opportunity to make an identification. He did make an identification, that was following being shown a photograph of the defendant and a discussion as to whether he was the prime suspect. . . . [A]t the hospital, he asked a question of the police officer how tall the person was . . . . [H]e was shown other lineups within the next couple of months. In one of those lineups, he picked out the wrong person as the shooter." The court found the other eyewitness's identification at the jurisdictional hearing questionable, observing that the witness "told four different stories" and previously told the police only that he had seen minor at the party, not that minor was the shooter.

## DISCUSSION

A. *Due Process and Sixth Amendment Claims*

Minor contends reversal is required because he was deprived of his due process and Sixth Amendment rights to notice, assistance of counsel, opportunity to prepare a defense, and a fair trial "when the prosecutor shifted his theory of the offense to aiding and abetting in his rebuttal argument." We disagree.

### 1. Background

A major theme of both the prosecutor's opening statement and closing argument was that minor was part of a group (or "strip team") who went to the party to steal and caused chaos and tragedy.[17] In his closing argument, the prosecutor argued minor's "plan was always to come *with others* and rob and steal with force" (italics added) and referred to the people minor brought to the party as "his posse" and "his crew."

In her closing argument, defense counsel responded that the characterization of minor "as the leader of a large group is not correct." She argued the surveillance video demonstrated minor did not arrive with a large group and he was not associated with the "big guy" Richard and Yokoi were

_____

[17] In his opening statement, the prosecutor argued M.M. identified minor from his Instagram account "as being the perpetrator or . . . *one of the group of people who did this*." (Italics added.) He argued, "[Minor] came to the party with an intent to rob and intent to steal. . . . *They* came there to rob." (Italics added.) In his closing argument, the prosecutor referred to "individuals, including [minor] who came to the party intending to rob." He argued it was clear that minor "thinks of himself as associated with individuals or with a group that will strip you," that his messages to M.M. about the party showed he associates himself with "[a] *group of people who go and rob people*." (Italics added.) He argued that minor sent the address of the party "to other individuals who showed up and participated in this robbery, the fights, the robbery and the shooting."

11

following out to the alley right before they were shot.[18] Defense counsel stated there were "ho[]rd[e]s of teenagers" who entered the backyard before and after minor arrived and suggested many of these partygoers could have been unknown to Richard and his sons yet unaffiliated with minor. She asked, "So how many of those people were just other [M.M.] invitees that weren't with [minor]. We don't know that."

As to the robbery charge, defense counsel argued there was no proof beyond a reasonable doubt either that minor was the person who took J.M.'s chains or that force or fear was used in taking the chains. She asserted, "the fight is not a robbery," but also stated that witnesses gave conflicting accounts about whether minor "at all was involved in the physical fight that happened after the unidentified person took [J.M.]'s chain."

In his rebuttal, the prosecutor responded that the element of force or fear required for robbery was established by the force used in grabbing J.M.'s chains and the threats used to retain them. Then he argued, "Your Honor, when it comes to the robbery itself, the biggest things the defense ignored is that [minor] is guilty of robbery as an aider and abettor, even if he didn't actually snatch the chain from [J.M.]'s neck."

Defense counsel objected to this statement "as improper rebuttal," stating, "The prosecutor never before argued a theory of aiding and abetting, which is why I didn't address it." The court responded, "Well, it's in his pleading. I think he can argue it. [¶] Go ahead." The prosecutor then argued minor "developed the intent to rob before arriving on the scene. . . . That's why he sent the address [of the party] to others. . . . He participated in the

---

[18] Understandably, given the seriousness of the charges, both counsel devoted most of their closing arguments to the evidence supporting the murder and attempted murder counts (that is, identification of the shooter).

12

fight . . ., and he had the stolen property . . . on the video that he posted two days later. At the very least, he is guilty of robbery as an aider an abettor."

Defense counsel did not ask to reopen argument to respond.

2.      Applicable Legal Principles

The Sixth Amendment grants a criminal defendant the rights "to be informed of the nature and cause of the accusation" and "to have the [a]ssistance of [c]ounsel." (U.S. Const., 6th Amend.) "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*In re Hess* (1955) 45 Cal.2d 171, 175.)

" '[D]ue process requires that a minor, like an adult, have adequate notice of the charge so that he may intelligently prepare his defense. (*In re Gault* (1967) 387 U.S. 1, 33 . . . .)' " (*In re Robert G.* (1982) 31 Cal.3d 437, 442.) The United States Supreme Court has held that, in juvenile delinquency matters, due process requires notice "be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.' " (*In re Gault*, at p. 33.)

The *Gault* court further recognized that, "Due process of law [in juvenile delinquency matters] requires . . . notice which would be deemed constitutionally adequate in a civil or criminal proceeding." (*In re Gault, supra*, 387 U.S. at p. 33.) We therefore begin with case law that addresses what constitutes constitutionally adequate notice in adult criminal proceedings.

"Under California's practice of short-form pleading, an instrument charging a defendant as a principal is deemed to charge him as an aider and

13

abettor as well.  (§ 971.)"  (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70 (*Quiroz*).)  This is because "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed." (§ 31.)  Consequently, "one may be convicted of aiding and abetting without the accusatory pleading reciting the aiding and abetting theory so long as defendant is charged in that pleading as a principal to the substantive offense and thus receives notice of the charge against him."  (*People v. Greenberg* (1980) 111 Cal.App.3d 181, 188; see *People v. Garrison* (1989) 47 Cal.3d 746, 776, fn.12 [quoting *Greenberg*].)[19]

"Nevertheless, an otherwise proper pleading may in unusual circumstances fail to afford due process notice."  (*People v. Lucas* (1997) 55 Cal.App.4th 721, 737 (*Lucas*).)  In particular, "due process will not tolerate . . . the People affirmatively misleading or ambushing the defense with its [legal] theory."  (*Quiroz, supra*, 215 Cal.App.4th at p. 71.)

In *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, 1236 (*Sheppard*), the state *conceded*, " 'in the circumstances of this case,' " that the defendant was denied adequate notice " '*because a pattern of government conduct*

_____

[19] Minor argues California's criminal pleading statute, section 971, does not apply to juvenile proceedings.  This argument does not advance his claim because it does not affirmatively show juvenile wardship petitions are *required* to state for each count whether the prosecution intends to prove the offense under an aiding and abetting theory.  In any event, minor's claim is constitutional, not statutory.  Thus, the question is whether minor in this case was "advised of the charges against him [such] . . . that he . . . [had] a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial."  (*In re Hess, supra,* 45 Cal.2d at p. 175.)

14

*affirmatively misled the defendant,* denying him an effective opportunity to prepare a defense.' " Under those facts, the Ninth Circuit Court of Appeals held that automatic reversal was required. (*Id*. at p. 1237.)[20]

"By contrast, in cases where a new theory is introduced late in the game for reasons other than prosecutorial gamesmanship, courts have employed a harmless error test. That test looks to whether the late notice 'unfairly prevented [defense counsel] from arguing his or her defense to the jury or . . . substantially mislead [counsel] in formulating and presenting arguments.' " (*Quiroz, supra*, 215 Cal.App.4th at p. 71, quoting *United States v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 458.)

3.     Analysis

In juvenile court matters, due process requires the minor "be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation." (*In re Gault, supra*, 387 U.S. at p. 33.) Minor received such notice in this case.[21]

Minor points out that juvenile court proceedings, unlike adult criminal proceedings, do not provide for preliminary hearings. He quotes Justice

---

[20] *Sheppard* is not binding on this court, and we have previously observed that the opinion is "difficult to square with" our high court's binding precedent (*People v. Crawford* (1990) 224 Cal.App.3d 1, 8) and that "California and Ninth Circuit decisions have uniformly viewed *Sheppard* narrowly and limited it to its facts" (*Lucas, supra*, 55 Cal.App.4th at p. 738).

[21] The operative petition alleged for count 2, "On or about July 20, 2018, minor [I.W.] did commit a felony namely: 2ND DEGREE ROBBERY, a violation of Section 211 of the Penal Code . . . in that said minor did unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of" J.M.

15

Sims's concurring opinion in *People v. Gordon* (1985) 165 Cal.App.3d 839, 870 (*Gordon*) (conc. opn. of Sims, J.): "[A]n information plays a limited but important role: it tells a defendant what *kinds* of offenses he is charged with (usually by reference to a statute violated), and it states the *number* of offenses (convictions) that can result from the prosecution. But the time, place and circumstances of charged offenses are left to the preliminary hearing transcript; it is the touchstone of due process notice to a defendant."

Justice Sims's observation does not mean, however, that the absence of preliminary hearings in juvenile wardship proceedings necessarily violates due process. Here, minor learned of "the time, place and circumstances of charged offenses" (*Gordon, supra,* 165 Cal.App.3d at p. 870) through the petition allegations and the prosecution evidence provided to defense counsel well before the jurisdictional hearing.[22] Defense counsel had Instagram records showing messages between minor and M.M. sent on the day of the party in which minor said he was going to pull up to the party "two cars deep" and try "to strip shit" and messages sent by minor relaying the address of the party to nine recipients. Defense counsel had police reports documenting witness statements to officers about what happened at the party and knew, for example, that J. identified minor as "the leader" who came into the party first. And defense counsel knew of a photograph from social media showing minor with a group of males, including one wearing clothing that said, "strip team." Thus, it was clear to defense counsel that the prosecution's evidence

___

[22] The record shows that an expert psychologist for the defense reviewed over 1300 pages of police reports including witness statements and minor's Instagram messages to M.M. and others in preparation for a transfer hearing held in April 2020. This, in turn, shows defense counsel had this prosecution evidence (and was able to provide it to a retained expert) months before the jurisdictional hearing, which began in August 2020.

16

suggested minor intended to steal from party guests in concert with a group of people he was going to take to the party.[23]

On this record, minor was not "taken by surprise by evidence offered at his trial." (*In re Hess, supra*, 45 Cal.2d at p. 175). Defense counsel had adequate notice of the charges—and the prosecution's evidentiary support for those charges—to " 'intelligently prepare [minor's] defense.' " (*In re Robert G., supra*, 31 Cal.3d at p. 442.) And minor has not shown the prosecutor in this case engaged in " 'a pattern of government conduct [that] affirmatively misled' " minor such that automatic reversal would be called for. (Cf. *Sheppard, supra*, 909 F.2d at p. 1236, italics deleted.)

Still, there is no denying the prosecutor argued the aiding and abetting theory for the first time very "late in the game" (*Quiroz, supra*, 215 Cal.App.4th at p. 71), and we do not condone this practice. Fairness in this circumstance dictated that defense counsel be given an opportunity to argue in response to the prosecutor's theory that minor was guilty of robbery as an aider and abettor. (See *People v. Ardoin* (2011) 196 Cal.App.4th 102, 129 (*Ardoin*) [where the trial court decided to give a felony-murder instruction as to a defendant after closing argument, "fairness dictated that the court also reopen the case for the limited purpose of granting [defense] counsel the right to offer rebuttal argument"], disapproved of on a different point by *People v. Dalton* (2019) 7 Cal.5th 166.)

But here defense counsel did not ask to reopen argument to respond. Minor has therefore forfeited any claim that the juvenile court improperly

---

[23] Defense counsel had further notice of the prosecution's theory of the case from two transfer hearings to determine whether minor should be tried as a juvenile or as an adult. At a transfer hearing in July 2019, for example, the prosecutor argued minor's "actions appear to have been those of the leader" as "minor was the one invited and who brought along others."

17

denied him an opportunity to present argument on aiding and abetting.  (See *People v. Bishop* (1996) 44 Cal.App.4th 220, 235 ["By failing to request additional argument to address this new theory of culpability, appellant has waived his objection to counsel's lack of opportunity to present an argument on the aiding and abetting special circumstance instruction"].)

Minor suggests such a request would have been futile.  The juvenile court responded to defense counsel's objection of "improper rebuttal" by stating, "it's in [the] pleading.  I think he can argue it."  Minor argues the court was mistaken because the petition did not mention aiding and abetting.  But the court may have meant only that the robbery charge is deemed to include the possibility of aider and abettor liability.  (§ 971; *Quiroz, supra*, 215 Cal.App.4th at p. 70.)[24]  Nothing in the court's response indicates it would have denied a defense request for surrebuttal.  On this record, minor has not established it would have been futile for defense counsel to ask for an opportunity to argue in response to the aiding and abetting theory.

Finally, we again observe defense counsel was well aware throughout the proceedings of the prosecution's theory that minor went to the party with a group of people—a "strip team"—who shared an intent to steal.  In her closing argument, defense counsel urged that minor was not "the leader of a large group" and cited surveillance video showing he arrived at the party with no more than two people.  She argued the fight (i.e., the attack of Alvarez) that followed the grabbing of J.M.'s chains should not be considered a continuation of the theft and, alternatively, there was insufficient evidence minor was involved in that fight.  Thus, defense counsel recognized the grabbing of the chains and the ensuing attack of Alvarez might be viewed as

---

[24] To the extent minor now claims this pleading presumption does not apply in juvenile proceedings, he did not raise this objection at the hearing.

18

a continuing *group* activity. Having reviewed the hearing transcript and given that defense counsel elected not to request surrebuttal, we cannot say minor was unfairly prevented from arguing his defense or substantially misled in formulating and presenting arguments. (See *Ardoin, supra,* 196 Cal.App.4th at p. 134 [concluding the defendant was not unfairly prevented from arguing defense or substantially misled where, "from our reading of the record we do not perceive that defense counsel's argument on the felony-murder issue would have appreciably differed or been any more persuasive if the case had been reopened"; the defendant failed to show prejudicial error or deficient performance by counsel].) Defense counsel was able to, and did, argue that minor was not responsible for the conduct of other unknown partygoers, and she reasonably may have decided further argument on aiding and abetting was not necessary.

On appeal, minor suggests that, had the prosecutor explicitly raised the aiding and abetting theory earlier, defense counsel could have argued that "sending out the address of a party doesn't establish an intent to aid an unspecified person in a future robbery" and "texts about stealing marijuana from cars didn't demonstrate an intent or conduct to aid someone in a robbery of chains from a guest at the party," but we do not believe such arguments are reasonably likely to have made a difference in the juvenile court's determination.

B. *Sufficiency of the Evidence*

Next, minor contends no substantial evidence supports a finding he committed robbery because (1) witnesses were unable to identify minor as the perpetrator of the theft; (2) there was no substantial evidence the chains were taken through force or fear; and (3) there was insufficient evidence that minor aided and abetted the theft of the chains.

19

"The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials: We review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the charge, so that a reasonable trier of fact could find guilt beyond a reasonable doubt." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1518.)

"The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the . . . verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the [fact finder]'s duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the [fact finder], not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing

court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id*. at pp. 357–358.)

1.     Evidence Minor Grabbed the Chains

Minor argues the evidence he committed robbery was insufficient because the witnesses "were unable to adequately identify [him] as the perpetrator of the theft."

Minor's Instagram messages to M.M. showed that he intended to steal from people at the party. Surveillance video suggested minor arrived at the party shortly before J.M.'s chains were taken. J.M. testified that he told the person who took his chains to "give me my shit back," and the person responded something like, "what are you going to do about it." According to J.M., Alvarez said something along the lines of "don't do that, dude" to the person who took his chains. Alvarez testified that he heard J.M. asking a person for his chains back and that person was "in [J.M.'s] face," yelling at J.M. Alvarez testified that he told the person in J.M.'s face to give back the chains. Two days after the party, minor recorded an Instagram video in which he was wearing a crucifix pendant that looked like the crucifix pendant taken from J.M. Twelve days after the party, Alvarez picked minor's photo out of a lineup and identified him as "[t]he person in [J.M.]'s face." Richard's son J. testified he saw Alvarez tell someone to "give the chain back" and identified minor as the person Alvarez was talking to. This was substantial evidence supporting a finding minor was the person who grabbed J.M.'s chains.

That more than two years after the party, J.M. could only describe the perpetrator's clothing and general appearance and Alvarez could say only that minor appeared similar to the person who had been in J.M.'s face do not

preclude the existence of sufficient support for the finding. (See, e.g., *People v. Boyer* (2006) 38 Cal.4th 412, 480 ["a testifying witness's out-of-court identification is probative [of identity] and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court"]; *People v. Mohamed* (2011) 201 Cal.App.4th 515, 522 [one witness's "inability to be 100 percent certain of her curbside identification and [another witness]'s expression of 'a little bit' of doubt about his curbside identification at trial do not preclude the existence of sufficient support for the jury's verdict"]; *People v. Lindsay* (1964) 227 Cal.App.2d 482, 494 ["identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing"]; *People v. Spellings* (1956) 141 Cal.App.2d 457, 460 [where "the victim was unwilling to positively identify the appellant as the robber [but] . . . said that he looked like the same man," the sufficiency of "the identification of the appellant as the robber . . . was a question of fact for the jury"].) Nor do witnesses' conflicting descriptions of the perpetrator defeat the substantial evidence that minor was the person who grabbed J.M.'s chains. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["given the chaos prevailing at the [scene of the crime], conflicting descriptions would not be particularly surprising"].)

To the extent minor suggests Alvarez's and J.'s identifications of him are irrelevant because they did not observe the chains being taken from J.M., he is mistaken. The juvenile court could reasonably infer that the person Alvarez identified as "in [J.M.'s] face yelling at him" and J. identified as the person Alvarez told "to give the chain back" was the person who grabbed the chains.

In short, we reject minor's claim that insufficient evidence was presented to support a finding he grabbed J.M.'s chains.

22

2. Evidence of Use of Force or Fear

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Minor argues the taking of J.M.'s chains did not amount to robbery because no force or fear was used. This argument lacks merit.

J.M. testified that a person grabbed his chains and "broke the clasp." He felt a "little pop on the back of [his] neck" and "had like a bruise of that little clasp." J.M. was left with "a mark" on his neck "like a little dot."

In *People v. Gonzalez* (2021) 59 Cal.App.5th 643, 645 (*Gonzalez*), the defendant Gonzalez similarly snatched necklaces from three victims and was convicted of three counts of robbery. In one instance, Gonzalez "grabbed a gold necklace from [the victim]'s neck. The necklace broke and the man ran off with it"; in another, the victim was left "with 'a little bump,' 'a red spot on [his] neck.' " (*Ibid.*) The Court of Appeal held this was enough force to qualify as robbery. (*Id.* at p. 650.)

The court explained that " 'force' " "in the context of robbery is commonly understood." (*Gonzalez*, *supra*, 59 Cal.App.5th at p. 650, citing Com. to CALCRIM No. 1600 (2020 ed.) p. 1132.) "Gonzalez's actions satisfy this standard of a commonly understood level of force. Owners of gold necklaces do not remove them by yanking them off the neck and breaking them. No one does that in an ordinary setting. It ruins the necklace. When another person yanks your necklace from your neck, the act is forceful. This fact is commonly understood." (*Gonzalez* at p. 650; see also *People v. Roberts* (1976) 57 Cal.App.3d 782, 787 ["evidence that the purse was grabbed with such force that the handle broke supports" a robbery conviction].)

23

In this case, the evidence that the clasp of J.M.'s chain broke and the action left a mark on J.M.'s neck is sufficient to establish the use of force necessary for robbery. Furthermore, use of force to retain stolen property supports a robbery conviction. (*People v. Gomez* (2008) 43 Cal.4th 249, 264.) Evidence that Alvarez was attacked and pushed into a window after he told minor to give back J.M.'s chain also supports a finding of use of force.

### 3.  Evidence of Aiding and Abetting

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Minor acknowledges there was sufficient evidence that J.M.'s chains were stolen. The prosecution also presented evidence tending to show minor's plan was to bring people ("two cars deep") to the party to steal ("strip") from random partygoers; minor did bring people to the party (recall M.M.'s testimony that minor asked if he could bring "my people" into the party) who were unknown to other party guests; J.M. knew most of the people at the party but did not recognize the person who took his chains; after Alvarez told the person who took J.M.'s chains to give them back, minor was involved in the fight that resulted in Alvarez being pushed into a window; and minor had J.M.'s crucifix pendant two days after the party (and was, perhaps, bragging by posting himself wearing the stolen item on social media).

A reasonable fact finder could infer from this evidence that, even if he did not grab the chains himself, minor brought the unknown person who took J.M.'s chains (the perpetrator) to the party, that minor and the perpetrator

24

shared an intent to steal from partygoers, and that minor aided and instigated the commission of the crime by bringing the perpetrator and facilitating his entry into the party and by fighting Alvarez after he told the perpetrator to return the chains. Accordingly, minor's claim that there was insufficient evidence to support a finding minor aided and abetted the robbery fails.

C. *Declaring a Prior Offense a Felony*

Finally, minor argues the juvenile court abused its discretion by declaring a prior offense a felony. We are not persuaded.

1. Background

In a prior juvenile court matter in Sacramento County, minor admitted possession of a firearm in violation of section 29610, which provides, "[a] minor shall not possess a handgun" or "a semiautomatic centerfire rifle." (§ 29610, subds. (a) and (b).) Minor was declared a ward of the court, and he was still a ward of the court in Sacramento County when it was time for disposition in this case in Solano County.

At a dispositional hearing on November 4, 2020, the Solano County juvenile court adjudged minor a ward of the court and committed him to the Division of Juvenile Justice (DJJ) for a maximum of five years, the high term for robbery. The court stated the maximum term included a concurrent eight-month term for the prior firearm offense, although the Sacramento County matter was not before the court at that time.

On January 12, 2021, the DJJ wrote to the Solano County court that it had accepted minor and would "reach out to schedule a delivery date for [minor]." On March 9, 2021, minor filed a request to change court order (Judicial Council Forms, form JV-180) on the ground the disposition was unauthorized under Welfare and Institutions Code section 731, which

25

specifies a ward may not be committed to the DJJ for a period exceeding the middle term of imprisonment that could be imposed upon an adult convicted of the same offense (three years in this case). (Welf. & Inst. Code, § 731, subd. (b); former § 731, subd. (c), as amended by Stats. 2020, ch. 337, § 28.) On April 26, 2021, the juvenile court changed its disposition; it placed minor in the custody of his parents and ordered probation.

Meanwhile, on April 6, 2021, the Sacramento County Probation Department filed a motion to transfer minor's juvenile court case arising from the prior firearm violation to Solano County. On May 12, the Sacramento County juvenile court granted the transfer, and on June 15, the Solano County juvenile court accepted the transfer.

At a hearing on June 15, 2021, defense counsel told the Solano County court, "I think you need to do two things. One, determine whether the prior gun case should be a felony or a misdemeanor. And, two, recalculate his max term by adding either four months if you think it's a misdemeanor or eight months if you think it's a felony." The court stated, "So what I would do is . . . make a finding it's a felony, extend his possible confinement time by eight months."

On July 30, 2021, a notice of probation violation was filed for failure to timely report a change of address. On September 1, 2021, the parties reached a negotiated disposition under which minor admitted the violation and agreed to remain in custody until his 21st birthday in October 2021, at which point probation would be terminated as unsuccessful and juvenile court jurisdiction would terminate by operation of law.

On September 20, 2021, minor's appellate counsel wrote to the juvenile court informing the court that its most recent dispositional order had not addressed the prior Sacramento County juvenile court matter (the firearm

offense).  She requested the court "issue an all-encompassing final dispositional order that includes the requisite felony/misdemeanor determination in the minutes of the court."

On November 16, 2021, the juvenile court held a hearing regarding appellate counsel's request and found the prior firearm offense to be a felony.

2.    Analysis

First, minor argues the juvenile court lacked authority to declare the offense a felony because it was deemed a misdemeanor by operation of law. He relies on section 17, subdivision (c), which provides, "When a defendant is committed to the Division of Juvenile Justice for a crime punishable, in the discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail not exceeding one year [i.e., a wobbler], the offense shall, upon the discharge of the defendant from the Division of Juvenile Justice, thereafter be deemed a misdemeanor for all purposes."  As minor recognizes, however, the Sacramento County matter had not been transferred to Solano County at the time the juvenile court committed minor to the DJJ for the current robbery offense.  The juvenile court did not have jurisdiction over the Sacramento County firearm offense when it issued the commitment order; therefore, section 17 does not apply because minor was not committed to the DJJ *for* the prior firearm offense.

Second, minor argues the record is insufficient to support a felony finding.  At the November 16 hearing, defense counsel stated the circumstances of the offense were that minor was "found in an apartment during a probation search for an adult who was on probation," "a gun was found . . . in the pocket of a jacket hanging in a closet," and "[p]olice asked for

27

consent to search [minor]'s phone and received it and found a picture of [minor] holding what appeared to be that same gun." The court observed, "A sixteen-year old flashing guns on his phone at that age where he was I think that's felonious conduct . . ., so I'll find it's a felony. . . ."

Welfare and Institutions Code section 702 provides, "If the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony." "[T]he requirement that the juvenile court declare whether a so-called 'wobbler' offense was a misdemeanor or felony . . . ensur[es] that the juvenile court is aware of, and actually exercises, its discretion under Welfare and Institutions Code section 702." (*In re Manzy W.* (1997) 14 Cal.4th 1199, 1207; see *In re F.M.* (May 4, 2023, No. S270907) __ Cal4th. __ [2023 WL 3239317, at *3].)

"[T]he decision whether to reduce a wobbler [to a misdemeanor rests] solely 'in the discretion of the court.' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)[25] " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' " (*Id.* at pp. 977–978.)

---

[25] *Alvarez* concerned an adult criminal defendant and discusses section 17, subdivision (b), but minor cites *Alvarez* as relevant in the juvenile court context.

Here, the juvenile court understood it had discretion to declare the prior firearm offense either a misdemeanor or a felony and it exercised its discretion.  Minor has not shown abuse of discretion on this record.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P.J.


_____
Markman, J.*


A161394, *People v. I.W.*

_____

\* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.